BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS, Petitioner, v. THE ILLINOIS EDUCATIONAL LABOR RELATIONS BOARD *et al.*, Respondents.

Fourth District   No. 4—91—0934

Opinion filed September 30, 1992.

710

GREEN, P.J., dissenting.

R. Theodore Clark, Jr., Thomas J. Piskorski, and Lisa A. Lopatka, all of Seyfarth, Shaw, Fairweather & Geraldson, of Chicago, for petitioner.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and Susan Frederick Rhodes, Assistant Attorney General, of Chicago, of counsel), for respondent Illinois Educational Labor Relations Board.

David J. Mathews, of Carmell, Charone, Widmer, Mathews & Moss, of Chicago, for other respondent.

JUSTICE STEIGMANN delivered the opinion of the court:

In March 1990, the International Union of Operating Engineers, Local 339 (Union), filed a petition with the Illinois Educational Labor Relations Board (Board) on behalf of the building service supervisors (BSSs) and building service foremen (foremen) employed in the Housing Division (Residential Services) (hereafter Housing Division) at the Champaign-Urbana campus of the University of Illinois (University). The petition sought to include BSSs and foremen within a bargaining unit of Housing Division employees represented by the Union. In August 1990, a hearing officer for the Board found that the BSSs and foremen were supervisors under section 2(g) of the Illinois Educational Labor Relations Act (Act) (Ill. Rev. Stat. 1989, ch. 48, par. 1702(g)), and therefore were not eligible for union representation under the Act. (*Board of Trustees of the University of Illinois*, 6 Pub. Employee Rep. (Ill.) par. 1127, No. 90—RS—0017—S (Illinois Educational Labor Relations Board, hearing officer's recommended decision and order, Aug. 29, 1990) (hereinafter 6 Pub. Employee Rep. (Ill.) par. 1127).) In December 1990, the Board reversed that finding of the hearing officer and concluded that the employees in question were not supervisors under the Act. The Board remanded the case for the hearing officer to determine whether the BSSs held a sufficient community of interest with housing maintenance inspectors—who already formed an existing collective-bargaining unit—such that they could constitute a single

collective-bargaining unit. (*Board of Trustees of the University of Illinois*, 7 Pub. Employee Rep. (Ill.) par. 1011, No. 90—RS—0017—S (Illinois Educational Labor Relations Board, Dec. 17, 1990) (hereinafter 7 Pub. Employee Rep. (Ill.) par. 1011).) In April 1991, the hearing officer found that they did (*Board of Trustees of the University of Illinois*, 7 Pub. Employee Rep. (Ill.) par. 1047, No. 90—RS—0017—S (Illinois Educational Labor Relations Board, hearing officer's recommended decision and order, Apr. 3, 1991)), and in September 1991, the Board adopted that finding and ordered an election to determine union representation (*University of Illinois (Board of Trustees)*, 7 Pub. Employee Rep. (Ill.) par. 1103, No. 90—RS—0017—S (Illinois Educational Labor Relations Board, Sept. 13, 1991)). As a result of the ballot tally after the election, the union was certified on November 21, 1991, as the exclusive representative. The University appeals.

We reverse and remand for further proceedings.

## I. FACTS

Attached as an appendix to this opinion is an exhibit diagramming the hierarchy in the Housing Division as of October 1989. That exhibit reveals that an associate director supervises the entire Housing Division, which is then broken into eight departments, of which the Building Services Department (BSD) is not only the largest, but also comprises the majority of the entire Housing Division. A superintendent—who works just below the associate director—runs the BSD. Under the superintendent, seven BSSs supervise the seven zones in the BSD.

All but one of the seven BSSs supervise two foremen; the seventh BSS supervises one foreman. Although the University has considered the idea of hiring subforemen to help the foremen, no subforemen have yet been so employed. (The subforeman shown on the exhibit has since been promoted to foreman.) As of October 1989, 172 building service workers worked under the foremen—divided unevenly among the foremen, depending on the needs of each zone—and those workers provided the janitorial and maintenance services for the buildings. Thus, from top to bottom, the BSD hierarchy of the Housing Division was the following as of October 1989: 1 associate director, 1 superintendent, 7 BSSs, 13 foremen, and 172 building service workers.

The March 1990 Union petition sought to add the BSSs, the foremen, and the building service subforemen to a bargaining unit of employees currently represented by the Union. At that time, this

bargaining unit was composed of seven housing maintenance inspectors employed by the University at its Champaign-Urbana campus. The seven housing maintenance inspectors work under one of the separate, smaller branches of the Housing Division. That branch is comprised of only one maintenance supervisor immediately under the associate director of housing and the seven maintenance inspectors immediately under the maintenance supervisor. The bargaining unit of housing maintenance workers was established before the Act was enacted in 1983.

Because the University did not consent to a union election in the present case, a Board hearing officer conducted a hearing on the Union's petition. The hearing focused primarily on whether the duties and responsibilities of BSSs, foremen, and subforemen constituted "supervisory" functions such that those employees were not eligible for union representation. The University stipulated at the hearing that the building service subforemen were not supervisors.

The evidence at the hearing consisted of job descriptions provided by the University and testimony from some of the employees at issue regarding their duties and responsibilities. The job description that the University provides to its applicants for the BSS position described the duties and responsibilities of that position as follows:

"1. Supervise and help to administer an effective and efficient cleaning program for the Housing Division buildings.

2. Supervise 2 or more Building Service Foremen.

3. Oversee and direct the procedures for hiring Building Service Workers in the zone.

4. Participates [sic] in the selection of Foremen in the zone.

5. Implement necessary training from an established training program.

6. Process necessary discipline procedures for review at the next level.

7. Monitor the ordering, distribution, and care of supplies and equipment.

8. Effect an ongoing employee performance evaluation program.

9. Supervise the preparation of the budget for the zone.

10. Perform other related duties."

This job description also lists the following as requirements for the job:

"1. Knowledge of Building Service materials, methods, and procedures.

2. High school graduation.

3. Supervisory abilities.

4. 3 years of janitorial supervisory experience."

Willard Cox, a BSS, testified that he supervised maintenance at six University buildings. He supervised an overall staff of 50 building service workers during the school year and 34 during the summer. He spent less than 5% of his time actually doing the work of a building service worker and about 50% of his time out of the office evaluating the performance of building service workers. He spent a good deal of his office time discussing the performance of the workers with the foremen and documenting these evaluations. However, he acknowledged that the foremen hold the primary responsibility for directly supervising and assigning work to the building service workers and that the foremen then report to the BSS.

The University's description of the duties of and requirements for a foremen read as follows:

"This position will be responsible to help administer a program that will insure that good quality custodial services are given to the [University] Housing Residence Hall area assignments ***.

***

The foreman will be required to help maintain an office and a supply and equipment room. The office duties will include the complete processing of time cards, filling out reports, writing letters, ordering supplies, issuing supplies, see that equipment is cared for, help make daily assignments, establish work priorities, assist his/her supervisor in making out annual budget, help promote and conduct a safety awareness program, assist in preparing assignment guides, deliver pay checks, inspect assignments for work needed and work completed, and conduct employee training sessions.

KNOWLEDGE REQUIRED FOR THE JOB

1. Knowledge of building services material, methods, and procedures.

2. Supervisory ability.

3. Grade school graduation.

4. Three years janitorial experience.

5. Must be able to speak before a large group and conduct training sessions.

Additional desirable qualifications:
1. High school graduation.
2. Supervisory experience."

Billy Mitchell, a foreman, testified that he spent 70% of his time "walking around looking at the jobs the employees are doing, checking to see if anything is done or needs to be done." He explained that this meant he spent about 65% of his time evaluating the work of building service workers and about 5% of his time actually doing that work himself. He spent an additional 5% to 10% of his time discussing the performance of the building service workers with the BSS. The remaining 20% to 25% of his time he spent doing bookkeeping, filling out formal evaluations of probationary and certified (nonprobationary) employees, and creating schedules for the building service workers that direct them on what they should do during their eight-hour shifts. He also helped the BSS prepare annual formal evaluations of the workers under him. He continually and informally evaluated the performance of the building service workers.

Kip Mecum, a superintendent who oversees the work of the BSSs, testified that when the foremen actually do the work of the building service workers, they do so mostly to demonstrate to the workers how the work should be done. He further explained that approximately 80 to 85 of the workers in 1990 were probationary employees. Although the foremen and BSSs prepare formal evaluations of certified (nonprobationary) employees only once a year, they prepare formal evaluations of probationary employees every month. These formal evaluations take approximately 15% of each foreman's time. Mecum also testified that foremen should spend about 30% of their time evaluating the performance of building service workers, 10% training them, 10% discussing their work performance with the BSSs, 5% resolving informal grievances, and 5% to 10% assigning work.

Additionally, the evidence showed that the BSSs and foremen do not have the unilateral power to fire employees. They can recommend that such action be taken, although none has found it necessary to do so. Both the foremen and the BSSs participate in hiring workers, with the foremen conducting individual interviews with all potential workers. The BSSs also approve vacation time, although they do not set pay levels. Both Cox and Mitchell testified that they seldom needed to discipline their workers, but that they both held the authority and responsibility to do so when necessary.

The hearing officer found that the BSSs and foremen spent a preponderance of their time performing supervisory functions that require independent judgment and that they therefore fell within the definition of "supervisor" in section 2(g) of the Act (Ill. Rev. Stat. 1989, ch. 48, par. 1702(g)). (6 Pub. Employee Rep. (Ill.) par. 1127, at IX-455.) The hearing officer therefore recommended that the Board deny the petition. (6 Pub. Employee Rep. (Ill.) par. 1127, at IX-456.) However, the Board reversed this finding and held that, even though the BSSs and foremen spent "65 percent of their time 'evaluating' employees, this function is largely one of 'assigning and directing' work, and not of 'supervising' work." (7 Pub. Employee Rep. (Ill.) par. 1011, at IX-61.) In so holding, the Board followed its earlier decision in *Southern Illinois University Board of Trustees*, 4 Pub. Employee Rep. (Ill.) par. 1030, at IX-122, No. 86—RC—0018—S (Illinois Educational Labor Relations Board, Nov. 17, 1987) (hereinafter 4 Pub. Employee Rep. (Ill.) par. 1030), which held that "assigning" and "directing" did not constitute "supervisory" work. 7 Pub. Employee Rep. (Ill.) par. 1011, at IX-60 through IX-61.

## II. THE DEFINITION OF "SUPERVISOR" UNDER THE ACT

■ This case raises the issue of whether certain employees in the University's Housing Division can elect union representation under the Act. Section 3 of the Act grants "educational employees" the right to organize for purposes of collective bargaining. (Ill. Rev. Stat. 1989, ch. 48, par. 1703.) Section 2(b) of the Act defines "[e]ducational employee" as follows:

"[A]ny individual, *excluding supervisors, managerial, confidential,* [and] *short term employees,* *** employed full or part time by an educational employer ***." (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 48, par. 1702(b).)

In the present case, even though the BSSs and foremen could arguably be managerial employees, the parties have focused solely on whether they are "supervisors."

■ Section 2(g) of the Act defines "supervisors" as follows:

" 'Supervisor' means any individual having authority in the interests of the employer to hire, transfer, suspend, lay off, recall, promote, discharge, reward or discipline other employees within the appropriate bargaining unit and adjust their grievances, or to effectively recommend such action if the exercise of such authority is not of a merely routine or clerical nature but requires the use of independent judgment. The term 'supervisor' includes only those individuals who devote a

preponderance of their employment time to such exercising authority." (Ill. Rev. Stat. 1989, ch. 48, par. 1702(g).) This court has previously broken this definition down into three components: (1) the employee must have the authority to perform some of the functions of supervisors or to effectively recommend such action; (2) those functions must require the use of independent judgment and not be merely clerical or routine in nature; and (3) the employee must spend a preponderance of his or her time exercising these functions. *Chicago Principals Association, Local 2 v. Illinois Educational Labor Relations Board* (1989), 187 Ill. App. 3d 64, 67, 543 N.E.2d 166, 168.

The present case focuses on the first of these components and raises a question of statutory interpretation: Does one who "assigns and directs" the work of others come within the section 2(g) definition of "[s]upervisor"? We hold that the answer is yes.

In *Southern Illinois University*, the Board held that the employee at issue did not constitute a supervisor because "[m]ost of [that employee's] time—usually five to six hours per day—is spent estimating projects and ordering supplies." However, that employee also spent some of his time on the job "assigning" and "directing" certain lower employees. Addressing these duties, the Board stated that "assigning" and "directing" work does not constitute supervisory work under section 2(g) of the Act because the legislature conspicuously omitted these terms from the definition in section 2(g) of the Act. 4 Pub. Employee Rep. (Ill.) par. 1030, at IX-122.

As it did in *Southern Illinois University*, the Board points out (in support of its "conspicuous absence" argument) that the definitions of the term "supervisor" in other significant labor laws do contain the terms "assign" and "direct." Citing the Federal Act, Labor-Management and Employee Relations (5 U.S.C. §§7101 through 7135 (1988)), pertaining to employees of the Federal government; the Labor Management Relations Act, 1947 (also referred to as the National Labor Relations Act) (29 U.S.C. §§141 through 169 (1988)); and the Illinois Public Labor Relations Act (PLRA) (Ill. Rev. Stat. 1989, ch. 48, pars. 1601 through 1627)—all of which the Board asserts contain "assigning and directing" in the definition of "supervisor"—the Board argues that the conspicuous absence of these terms in section 2(g) of the Act indicates that the legislature intended that these functions *not* be included within the section 2(g) definition of "[s]upervisor."

However, the definition of "[s]upervisor" in the sole Illinois statute the Board cites, the PLRA, does not contain the word "as-

sign," although it does contain the word "direct." (See Ill. Rev. Stat. 1989, ch. 48, par. 1603(r).) Moreover, the definition of "[s]upervisor" in the PLRA is far more extensive and looks nothing like the definition in the Act (quoted above), thereby diminishing any argument that a comparison of the two somehow reveals legislative intent.

The definition of "[s]upervisor" from section 3(r) of the PLRA reads as follows:

> "(r) 'Supervisor' is an employee *whose principal work is substantially different from that of his subordinates* and who has authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, *direct*, reward, or discipline employees, or to adjust their grievances, or to effectively recommend such action, if the exercise of such authority is not of a merely routine or clerical nature, but requires the *consistent* use of independent judgment. Except with respect to police employment, the term 'supervisor' includes only those individuals who devote a preponderance of their employment time to exercising such authority State supervisors notwithstanding. In addition, in determining supervisory status in police employment, rank shall not be determinative. The Board shall consider, as evidence of bargaining unit inclusion or exclusion, the common law enforcement policies and relationships between police officer ranks and certification under applicable civil service law, ordinances, personnel codes or Division 2.1 of Article 10 of the Illinois Municipal Code, as amended from time to time, but these factors shall not be the sole or predominant factors considered by the Board in determining police supervisory status.
>
> Notwithstanding the provisions of the above paragraph, in determining supervisory status in fire fighter employment, no fire fighter shall be excluded as a supervisor who has established representation rights under Section 9 of this Act. Further, in new fire fighter units, employees shall consist of fire fighters of the rank of company officer and below; provided, if a company officer otherwise qualifies as a supervisor pursuant to the above paragraph, he or she shall not be included in the fire fighter unit; provided further, if there is no rank between that of chief and the highest company officer, the employer may designate a position on each shift as a Shift Commander and the persons occupying such positions shall be supervisors. All other ranks above that of company officer

shall be supervisors." (Emphasis added.) Ill. Rev. Stat. 1989, ch. 48, par. 1603(r).

These definitions contain obvious differences beyond the mere presence of the word "direct" in section 3(r) of the PLRA definition and the absence of that word in section 2(g) (the Act's definition). Under the Board's "conspicuous absence" argument, an educational employee apparently cannot be a supervisor if that employee has a job "whose principal work is substantially different from that of his subordinates" (Ill. Rev. Stat. 1989, ch. 48, par. 1603(r)) because that language appears only in section 3(r) of the PLRA definition of "[s]upervisor," and is "conspicuously absent" from section 2(g) (the Act's definition of "[s]upervisor"). Further, certain State universities have fire and police departments of their own. Under the Board's "conspicuous absence" argument, however, the Board cannot consider any of the factors set forth in section 3(r) of the PLRA's definition of "[s]upervisor" regarding fire and police department employees because none of those factors appears in section 2(g) of the Act's definition of "[s]upervisor."

■ We further note that in section 3(r) of the PLRA's definition of "[s]upervisor," the legislature spoke of those employees whose "exercise of * * * authority is not of a merely routine or clerical nature, but requires the *consistent* use of independent judgment." (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 48, par. 1603(r).) Yet in section 2(g) of the Act's definition of "[s]upervisor," the legislature omitted the word "consistent" in its *otherwise identical* (except for a comma) reference to employees whose "exercise of * * * authority is not of a merely routine or clerical nature but requires the use of independent judgment." (Ill. Rev. Stat. 1989, ch. 48, par. 1702(g).) We refuse to impart any deep meaning or significance to that omission, concluding instead that the legislature intended these definitions to be essentially the same and, more particularly, did *not* intend that omission to provide the basis of any distinction between these definitions. Similarly, we find the absence of the word "direct" from section 2(g) of the Act to fall far short of the significance the Board attaches to that absence in its "conspicuous absence" argument.

If the legislature truly intended any significant difference between the definition of "[s]upervisor" in the PLRA and in the Act, then it would not have indicated its preference by merely failing to include certain language in one that appears in the other. The General Assembly knows how to use phrases such as "but shall not include" or "shall be limited to." Instead, we attribute the difference

between the statutes to mere inadvertence. We therefore reject any argument that "assigning" and "directing" under the Act do *not* constitute supervisory functions merely because the term "direct" appears in the PLRA but does not appear in the Act.

We still must decide whether "assigning and directing" the work of subordinate employees falls within the definition in section 2(g) of the Act. We recognize that the legislature may, and often does, narrow the definition of a commonly used term to a meaning other than its ordinary one. "When a legislature defines the language it uses, its definition is binding upon the court even though the definition does not coincide with the ordinary meaning of the words." 1A N. Singer, Sutherland on Statutes & Statutory Construction §20.08, at 88 (Sands 4th ed. 1986).

■ However, even under the narrow definition of "[s]upervisor" in section 2(g) of the Act, "assigning" and "directing" and "evaluating" constitute supervisory work. Supervisors must assign, direct, and later evaluate work in order to decide whether to hire, transfer, suspend, lay off, recall, promote, discharge, reward, or discipline employees. In *Chicago Principals*, we recognized that a supervisor need not spend all of his time actually hiring, firing, and disciplining employees in order to meet the statutory definition in section 2(g) of the Act. *Chicago Principals*, 187 Ill. App. 3d at 69, 543 N.E.2d at 169.

Indeed, even the Board in *Southern Illinois University* has indicated that certain duties not enumerated in section 2(g) of the Act "may be considered in determining whether an individual is a supervisor." (4 Pub. Employee Rep. (Ill.) par. 1030, at IX-122.)

> "These duties include checking and approving work, enforcing safety rules, maintaining order, effectively recommending that overtime is necessary, excusing [employees] from work, arranging vacation schedules, appointing and overseeing the temporary foremen, discussing work scheduling and personnel problems at meetings *** and meeting with the [employees] to instruct them or to discuss problems that have arisen." (4 Pub. Employee Rep. (Ill.) par. 1030, at IX-122.)

None of these duties is explicitly included in section 2(g) of the Act, and none bears as strong a relation to the enumerated duties in section 2(g) of the Act as do "assigning" and "directing."

In essence, we agree with the Board that section 2(g) of the Act has to be read more broadly than its literal terms when deciding whether an employee is a supervisor. Our only disagreement with the Board arises from its excluding the terms "assign" and "di-

rect" from its expansive reading of that section. The Board concluded that those terms had to be excluded from section 2(g) of the Act because of its "conspicuous absence" analysis that we earlier discussed and rejected. Indeed, but for that analysis, we doubt that the Board would have excluded those terms from its interpretation of that section because, in common parlance, "assigning" and "directing" work are typically the hallmarks of a supervisor's functions.

■ Judicial review of administrative agency action extends to all questions of law and fact in the record. (*City of Freeport v. Illinois State Labor Relations Board* (1990), 135 Ill. 2d 499, 507, 554 N.E.2d 155, 159.) A reviewing court may reverse an administrative agency's finding of fact only if it is against the manifest weight of the evidence. (*City of Freeport*, 135 Ill. 2d at 507, 554 N.E.2d at 159.) However, "[w]here the question involved is one of law, such as the proper interpretation of a statute, the Board's finding is not binding on the [reviewing] court." (*City of Freeport*, 135 Ill. 2d at 507, 554 N.E.2d at 159-60.) We are aware that, "[a]s a general rule, courts will accord deference to the interpretation placed on a statute by the agency charged with its administration." (*City of Decatur v. American Federation of State, County, & Municipal Employees, Local 268* (1988), 122 Ill. 2d 353, 361, 522 N.E.2d 1219, 1222.) Underlying that general rule is a judicial acknowledgement of the expertise possessed by administrative agencies regarding the often arcane and highly technical issues with which those agencies routinely deal. However, we believe our decision in this case is in accordance with the "general rule" of *City of Decatur*. Our disagreement with the Board arises from a statutory construction by the Board that does not involve any arcane or highly technical issues; instead, the issue here is one of fairly routine statutory construction.

■ In this case, the Board construed section 2(g) of the Act as not including "assigning" and "directing" work. For the reasons stated, we disagree with that decision and reverse the Board's order. We remand this case to the Board so that it can consider anew whether the BSSs and foremen constitute supervisors under section 2(g) of the Act, as this court has now construed it.

Reversed and remanded with directions.

McCULLOUGH, J., concurs.

APPENDIX

HOUSING DIVISION: RESIDENTIAL SERVICES
ORGANIZATIONAL CHART

Revised 10/3/88

PRESIDING JUSTICE GREEN, dissenting:

Neither (1) the existence of the verbs "assign" or "direct" in most labor legislation defining the term "supervisor," (2) the existence of those verbs in all commonly used definitions of who are supervisors, (3) any possible definition of the duties of supervisors set forth by the Board in *Southern Illinois University* which is broader than that used by the Board here, nor (4) any combination of those factors, justifies the conclusion of the majority that the failure of the legislature to include those verbs in the definition of "[s]upervisor" in section 2(g) of the Act was merely oversight.

Both the Board and this court struggled with the narrow definition of section 2(g) of the Act in *Chicago Principals*. There, the Board recognized that while performing other functions, the principals were simultaneously evaluating teachers and making independent determinations in that respect. Thus, the principals were performing supervisory functions within the definition of section 2(g) of the Act. We agreed with the legal interpretation of the Board. Neither the Board nor this court attempted to incorporate activities of assignment or direction within the definition of "supervisor."

"Where the intention of the legislature is clearly expressed, the plain meaning of the statute must be given effect." (*Finley v. Finley* (1980), 81 Ill. 2d 317, 326, 410 N.E.2d 12, 16.) The majority correctly points out that a legislative body can, with binding force, narrow the definition of a term such as "supervisor" from its commonly used scope. (1A N. Singer, Sutherland on Statutes & Statutory Construction §20.08, at 88 (Sands 4th ed. 1986).) The Act differs from the PLRA in various respects. For instance, while section 8 of the PLRA expressly provides for proceedings to enforce, stay, or vacate arbitrator awards in the circuit court (Ill. Rev. Stat. 1991, ch. 48, par. 1608), the absence of such a provision in the Act was deemed to deny such proceedings to employers and employees. (*Board of Education of Community School District No. 1 v. Compton* (1988), 123 Ill. 2d 216, 222, 526 N.E.2d 149, 152.) I cannot agree that comparison of the two Acts indicates a similar interpretation should be given to each.

"The legislature has the power to define the terms, within a statute, in any reasonable manner." (*Commonwealth Edison Co. v. Property Tax Appeal Board* (1984), 102 Ill. 2d 443, 457, 468 N.E.2d 948, 953.) A reason for its defining the word "[s]upervisor" here differently in the Act than in PLRA could well have been that under the Act, the majority of employees covered would be professional academics and the concept of providing them with supervi-

sion would be different than under PLRA where that was not the case with most of the employees who would require direction.

In any event, as the majority points out, some deference should be given to the Board's interpretation of the Act, which it was created to enforce. (*City of Decatur*, 122 Ill. 2d at 361, 522 N.E.2d at 1222.) Understanding who might be considered supervisors or foremen of educational employees is not limited to labor experts in that field. However, the question of the functions to be performed by those considered not to be "employees" for the purpose of entitlement to participate in collective bargaining is a reasonably technical issue. We should ordinarily follow the interpretation of the Board on such a question when it conforms to the plain wording of a statute.

I dissent from the decision to reverse the Board's order and remand for further consideration of the status of the BSSs and foremen. I would uphold the Board determination that those individuals are not supervisors under section 2(g) of the Act and then proceed to consider the propriety of the Board's determination that the BSSs and foremen held a sufficient community of interest with housing maintenance inspection that they can constitute a single collective-bargaining unit.