SANDBURG FACULTY ASSOCIATION, IEA-NEA, Petitioner-Appellant, v. ILLINOIS EDUCATIONAL LABOR RELATIONS BOARD *et al.*, Respondents-Appellees.

First District (3rd Division)   No. 1—91—3473

Opinion filed June 30, 1993.

Lisa B. Moss and John F. Ward, both of Carmell, Charone, Widmer, Mathews & Moss, Ltd., of Chicago, for petitioner.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and Susan Frederick Rhodes, Assistant Attorney General, of Chicago, of counsel), for respondent Illinois Educational Labor Relations Board.

R. Theodore Clark, Jr., Robert J. Smith, Jr., and Sally J. Scott, all of Seyforth, Shaw, Fairweather & Geraldson, of Chicago, for respondent Carl Sandburg College.

JUSTICE GREIMAN delivered the opinion of the court:

Petitioner Sandburg Faculty Association, IEA-NEA (IEA), pursuant to Supreme Court Rule 335 (134 Ill. 2d R. 335), appeals an order of the Illinois Educational Labor Relations Board (Board) which denied its petition for an election to enlarge an existing collective bargaining unit of approximately 50 faculty members and counselors at Carl Sandburg College (College) by adding approximately 45 nonfaculty employees to the unit.

The IEA raises these issues for review: (1) whether the proposed unit is appropriate, under the traditional community of interest standard, as set out in section 7 of the Illinois Educational Labor Relations Act (Ill. Rev. Stat. 1991, ch. 48, par. 1707), or (2) whether the proposed unit is appropriate under the broader "wall-to-wall" unit standard.

Carl Sandburg Community College is a small public community college operated in Illinois Community College District No. 518 by the Board of Trustees of Illinois Community College District No. 518 and is subject to the rules and regulations of the Illinois Community College Board and the State Board of Higher Education. Ill. Rev. Stat. 1991, ch. 122, par. 102—1 *et seq.*

The College is a two-year institution which has its main campus and administrative offices located in Galesburg, Illinois, offering a va-

riety of courses geared to both baccalaureate and vocational programs. The College operates an extension center in Carthage, Illinois, which offers a night school program. The College also offers instruction at Hill Correctional Center (Hill), approximately two miles from the main campus in Galesburg, housing approximately 1,000 inmates. However, the educational services at Hill are provided under a contract with the Department of Corrections (DOC) which requires seven full-time faculty employees, one full-time academic adviser, one full-time secretary and one administrator be provided.

The DOC controls the terms and conditions of the College employees working at Hill and the College has little control over their day-to-day duties and functions.

The DOC (1) requires College employees to submit to mandatory security tests, drug tests and special security training; (2) requires the College employees be subject to DOC policies, regulations and procedures designed specifically and exclusively for a prison environment; (3) determines, in large part, the wages and work schedule of the workers at Hill; and (4) can terminate the College employees at Hill simply by failing to renew funding for the program.

The College's main campus consists of three buildings: the Fine Arts and Physical Education Building, the Butler Building, and the Main Building. A dean or director heads the College's different departments: building and grounds, data processing, food service, financial services, instruction, business services, joint training and partnership act, admissions and records, student services, Henry Hill Correctional Center Education, financial aid, community and extension services, learning resources and vocational technical education.

In January 1991, the IEA filed its petition with the Board seeking a self-determination election to add approximately 45 nonfaculty employees and three security employees not represented by a labor organization to an existing faculty unit of approximately 50 full-time faculty and counselors.

The IEA did not seek to add to the unit the seven instructors and an academic advisor who work for the College full-time at Hill.

In March 1991, a hearing officer issued a recommended decision and order dismissing the petition, finding that the basic terms and conditions of employment of the faculty and counselors are distinct from those of the nonfaculty and security employees sought to be joined.

In September 1991, the Board affirmed the hearing officer's findings, with one Board member dissenting. That member stated that the realities of a small community college environment lead to the

conclusion that the proposed unit has an identifiable community of interest under even the traditional standard and thus the unit could be enlarged as proposed.

We agree with the dissenting Board member and find that the Board inappropriately and erroneously placed undue emphasis on two factors and that the proposed unit is appropriate under the traditional community of interests analysis.

However, we also find that the unit is appropriate under a wall-to-wall standard that applies where the proposed unit consists of all educational employees of a single educational employer, including the nonprofessional with the professional, who are under the exclusive control of the employer.

█ In determining the appropriateness of a collective bargaining unit, the Illinois Educational Labor Relations Act (the Act) provides in section 7(a):

> "[T]he Board shall decide in each case, in order to ensure employees the fullest freedom in exercising the rights guaranteed by this Act, the unit appropriate for the purpose of collective bargaining, based upon but not limited to such factors as historical pattern of recognition, community of interest, including employee skills and functions, degree of functional integration, interchangeability and contact among employees, common supervision, wages, hours and other working conditions of the employees involved, and the desires of the employees." Ill. Rev. Stat. 1991, ch. 48, par. 1707(a).

█ While that section sets forth the elements of the traditional analysis, a wall-to-wall standard may be applied where the proposed unit consists of all of the educational employees of a single educational employer, including the nonprofessional employees with the professional. *Riverside-Brookfield Township District 208 & Riverside-Brookfield Education Association,* 5 Pub. Employee Rep. (Ill.) par. 1136, No. 89—RS—0003—C (IELRB July 25, 1989) (hereinafter 5 Pub. Employee Rep. (Ill.) par. 1136); *Du Page Area Vocational Education Authority,* 3 Pub. Employee Rep. (Ill.) par. 1050, No. 86—RC—0021—C (IELRB April 30, 1987) (hereinafter 3 Pub. Employee Rep. (Ill.) par. 1050), *aff'd Du Page Area Vocational Education Authority v. Illinois Educational Labor Relations Board* (1988), 167 Ill. App. 3d 927, 522 N.E.2d 292; *Alton Community Unit School District No. 11,* 2 Pub. Employee Rep. (Ill.) par. 1048, No. 85—RC—0012—S (IELRB March 11, 1986) (hereinafter 2 Pub. Employee Rep. (Ill.) par. 1048).

In a wall-to-wall unit, only a minimal showing of a community of interest among the subgroups is required to attain the goal of a con-

venient and efficient bargaining process and a single comprehensive agreement. *Alton*, 2 Pub. Employee Rep. (Ill.) par. 1048, at VII—121.

The IEA contends that the Board should have applied a wall-to-wall unit standard since the unit for which it petitioned constitutes a wall-to-wall unit of all educational employees over whom the College exercises exclusive control of the terms and conditions of employment.

Previously, the Board has narrowly determined that the advantages of a wall-to-wall proposal are diminished if less than all employees are sought to be represented:

> "In combining all employees, *** certain differentiating characteristics may be sacrificed. The benefits may be profound, especially in a small school district such as the employer's. ***
>
> Our approval of wall-to-wall units to achieve such benefits, however, does not mean that any lesser subgroup of employees is, therefore, also appropriate. The diminution of the requisite community of interest to establish a wall-to-wall unit simply does not pertain where less than all employees are sought to be represented. The benefits of wall-to-wall bargaining units are simply not available in such a situation, and, consequently, the sacrifice in community of interest factors cannot and should not be sanctioned." *Danville Community Consolidated School District 118*, 5 Pub. Employee Rep. (Ill.) par. 1084, at IX—194, No. 87—RS—0001—S (IELRB April 12, 1989) (hereinafter 5 Pub. Employee Rep. (Ill.) par. 1084).

In the case at bar, the Board rejected the wall-to-wall standard since the IEA omitted those employees who work at Hill and the Board found that the seven Hill employees' interests differ significantly from those of the employees in the proposed unit.

We have found no cases in Illinois which preclude the composition of a proposed wall-to-wall unit which includes all those employees whose terms and conditions of employment are under the direct and exclusive control of the employer where there exist other employees whose working conditions are established and controlled by an entity other than the employer.

The hearing officer noted in her March 1991 decision that the DOC employees lacked a sufficient community of interest with other College employees because of their unique work environment and "the input of the [DOC] in establishing and implementing the policies, regulation and procedures" by which the employees were governed.

Therefore, we see no policy reason why, based upon the standard described in *Riverside-Brookfield* and *Alton*, a proposed wall-to-wall

unit may not be approved where the terms and conditions of employment of the included employees of a single educational employer, including the nonprofessional employees, are under the direct and exclusive control of the employer while a small number of employees are under the control of someone other than the employer. See *Riverside-Brookfield*, 5 Pub. Employee Rep. (Ill.) par. 1136, at IX—317—18; *Du Page Area Vocational Education Authority*, 167 Ill. App. 3d at 937; *Alton*, 2 Pub. Employee Rep. (Ill.) par. 1048, at VII—119—121.

The general policy supporting the requirement that all employees be included in a proposed wall-to-wall unit is predicated on the principle:

"[A]ny practical difficulties encountered in bargaining simultaneously with the different subgroups within such a unit will be more than compensated for by the convenience and efficiency of the single set of bargaining sessions and by the administration of the resulting single comprehensive bargaining agreement." *Alton*, 2 Pub. Employee Rep. (Ill.) par. 1048, at VII—121.

In the instant case, every party agrees, as does the hearing officer and the Board, that the College employees at Hill do not work under the same terms and conditions as those at the main campus and in Carthage. Those employees work at the pleasure of the DOC: if funding is not renewed, the program will be discontinued. Their wages are determined largely by the State's budget, their working conditions—including work schedules and methods of teaching—are militated by the dangerous environment, as are even their personal lives, with security tests, drug tests and special security training a requirement. While the Hill employees ostensibly and in fact are employed by the College, the DOC exclusively controls the most important aspects of their day-to-day functioning, and the College's influence is clearly secondary and virtually benign.

Further, it has been held that parties may agree to a noninclusive wall-to-wall unit composed of less than all employees. (*Alton*, 2 Pub. Employee Rep. (Ill.) par. 1048, at VII—119.) In *Alton*, the Board affirmed the hearing officer's finding that a wall-to-wall unit of certificated and noncertificated educational employees would be appropriate, pending the self-determination approval of the unit by a majority of employees in each group. The approved unit would include all of the employees, faculty and otherwise, except certain employees that the parties agreed to exclude: two secretaries, four security employees, two middle school instructional coordinators, and three food service managers.

If including all employees in the unit is so critical, we fail to see the distinction where one plaintiff may petition and vote a proposed wall-to-wall unit composed of less than all employees simply because the employer agreed to it while another group of employees is denied the same unit composition as a matter of course because the employer chooses not to agree to inclusion of less than all employees. After this stipulation by the parties, the hearing officer and the Board no longer have before them facts upon which to base a wall-to-wall determination.

Thus, we see no reason to exclude the proposed unit under a wall-to-wall standard that includes less than all educational employees, where it does include all those employees, both professional and non-professional, whose terms and conditions of employment are under the direct and exclusive control of the employer. We reverse the Board's determination that the unit was inappropriate.

We also find that the Board improperly rejected the proposed unit under the section 7 traditional community of interests standard.

Judicial review of administrative agency action extends to all questions of law and fact in the record. (*Freeport v. Illinois State Labor Relations Board* (1990), 135 Ill. 2d 499, 507, 554 N.E.2d 155.) As a general rule, courts accord deference to the interpretation placed on a statute by the agency. (*City of Decatur v. American Federation of State, County & Municipal Employees, Local 268* (1988), 122 Ill. 2d 353, 361, 522 N.E.2d 1219; *Board of Trustees of the University of Illinois v. Illinois Educational Labor Relations Board* (1992), 235 Ill. App. 3d 709, 721, 600 N.E.2d 1292.) A reviewing court may reverse an administrative agency's finding of fact only if it is against the manifest weight of the evidence. (*Freeport*, 135 Ill. 2d at 507.) However, where the question involved is one of law, such as the proper interpretation or construction of a statute, the Board's finding is not binding on the reviewing court. *Freeport*, 135 Ill. 2d at 507; *Burbank v. Illinois State Labor Relations Board* (1989), 128 Ill. 2d 335, 345, 538 N.E.2d 1146; *University of Illinois*, 235 Ill. App. 3d at 721.

The Board found the proposed unit inappropriate because current unit members enjoy a unique employment relationship due to two working conditions "profoundly distinct" from those of other employees: the participation of faculty in the College's decision-making process, and the faculty's access to and participation in determining tenure for other faculty.

The Board found the faculty's "collegial" role in the College's decision-making process to be a decisive factor in rejecting the proposed

unit, citing *N L R B v. Yeshiva University* (1980), 444 U.S. 672, 63 L. Ed. 2d 115, 100 S. Ct. 856.

*Yeshiva* determined that the faculty of a private university were managerial employees and thus excluded from coverage under the National Labor Relations Act (NLRA). While the Board here conceded that the Illinois Act differs from the NLRA because the former explicitly extends coverage to higher education employees to include faculty, the Board found the observations in *Yeshiva* instructive regarding the "distinctive character collegial decision-making affords higher education faculty members as distinguished from other educational employees."

The Board determined the collegial role of the faculty at the College was established since certain College policies and regulations state that the administration must seek faculty advice on educational matters through the faculty assembly and its committees; the faculty assembly has been consulted on matters such as College curriculum, faculty evaluation, academic standards and student services; faculty is entitled to have one of its members participate in meetings of the College's board of trustees; and the assembly must be consulted on changes affecting its participation in College decisions.

A second significant factor that the Board focused upon was that faculty could obtain tenure while the other employees could not and that three faculty members participate in deciding whether other faculty will receive tenure.

The Board found that differences in duties also contributed to a lack of a community of interest between faculty and nonfaculty employees: faculty duties focus on teaching, counseling, preparing courses and materials, compiling material for class and serving on faculty committees while classified employees clean and maintain buildings, perform secretarial and clerical tasks, process data, promote College facilities, work with the athletic department, monitor the fitness center, and supervise campus security and traffic.

The Board also found differences in work year, work hours, method of determining pay, range of pay and qualifications. A historical pattern of recognition was also found to favor denying the proposed unit because the College has recognized the existing unit since 1974.

These findings are not borne out by the record. We disagree with the Board's determination that the unit was inappropriate.

We recognize that, as a general rule, courts accord deference to the interpretation placed on a statute by the agency charged with its

administration. *Decatur*, 122 Ill. 2d at 361; *University of Illinois*, 235 Ill. App. 3d at 721.

However, section 7(a) of the Act sets out the factors to be considered in determining an appropriate unit and we find that the Board improperly placed undue emphasis on two "working conditions"—the faculty's participation in the tenure process and participation in the College's decision-making process—to reach its decision.

Section 7(a) does not require that a proposed unit be the "most appropriate unit"; rather, it designates that the unit be "appropriate." The statute requires that in determining the appropriateness of a unit, each case should be individually considered "to ensure employees the fullest freedom" in exercising the rights guaranteed them under the Act. Ill. Rev. Stat. 1991, ch. 48, par. 1707.

The Board improperly and admittedly focused upon governance/collegiality and tenure while the facts and circumstances surrounding the other issues at this small community college clearly indicate that an identifiable community of interests exists, as viewed from the employees' perspective.

We believe that the Board placed undue emphasis upon those two factors such that all other factors failed to receive a balanced weighing in accordance with the goal of the statute—to ensure that employees receive the greatest freedom to exercise their rights under the Act, including the right to membership in a unit composed of both professionals and nonprofessionals. Ill. Rev. Stat. 1991, ch. 48, par. 1707.

Because we find the Board has misinterpreted the statute, we need not consider its decision as binding, and find that there exists a community of interest such that the proposed unit is appropriate. *Freeport*, 135 Ill. 2d at 507; *Burbank*, 128 Ill. 2d at 345.

Furthermore, even if we were to examine the Board's decision as binding, we would find it against the manifest weight of the evidence since we find the record here fails to demonstrate an overwhelming degree of faculty governance in the College's decision-making process and that the process relating to tenure is not a singular feature that automatically destroys a community of interest.

In *Yeshiva*, upon which the Board relied for its governance/collegiality argument, the collegiality was demonstrated through the faculty's exercise of control over both academic and nonacademic matters. Academically, the faculty determined what courses would be offered, when and to whom the classes would be offered; they determined teaching methods, grading policies and graduation standards; they determined which students would be admitted, which would be

retained and which would graduate; and occasionally they determined the size of the student body, tuition fees and made proposals for the location of a school. In nonacademic matters, the faculty was dominant in faculty hiring, tenure, sabbaticals, terminations and promotion. *Yeshiva*, 444 U.S. at 677, 686, 63 L. Ed. 2d at 122, 128, 100 S. Ct. at 859-60, 864.

*Yeshiva* is easily distinguished since, in that case, there was no doubt that the faculty was the dominating force behind a majority of decisions affecting all areas of campus life. It was never contended that the faculty there held only an advisory role in university affairs. (*Yeshiva*, 444 U.S. at 683, 63 L. Ed. 2d at 126, 100 S. Ct. at 862.) However, in the case at bar, the Board has placed disproportionate emphasis on the faculty's advisory role.

Here, there exists a faculty assembly; five standing committees: curriculum, faculty development, student services, marketing and college welfare; a tenure conference committee; a planning committee; the board of trustees; and any other committee which the College's board of trustees authorizes to be organized.

The board of trustees, elected by the voters of District 518, is the governing body of the College, and members include a faculty representative, a classified employee and a student representative among the members. The board's duties and powers include providing and maintaining revenue to run the College; calling for annual audits; payment of wages, orders and bills; assigning contracts for all materials or work in excess of $5,000; providing indemnity insurance; issuing bonds and raising monies for a working cash fund; and purchasing and leasing sites and erecting buildings.

All contractual faculty members are automatically members of the faculty assembly, which also has several subcommittees. However, at least four nonfaculty employees—two mid-management employees, a public coordinator of information, and a secretarial support staff employee—are also members of the faculty assembly or its subcommittees. The record is devoid of information regarding the faculty assembly's duties or responsibilities, outside of electing and appointing faculty representatives to various College committees.

Faculty, students, staff and administrative personnel each select members to the five standing committees. The committees meet on an *ad hoc* basis and report to a designated College official, who makes a recommendation to the College president, who in turn makes a recommendation to the board of trustees, which makes the final decision. There is no evidence as to the frequency of which committee recom-

mendations are followed or ultimately implemented by the board of trustees.

The tenure conference committee consists of three faculty members, the chief academic officer and a College administrator. The faculty members compile tenure evaluations made by faculty, students, supervisors and the candidate for tenure and present them to the full tenure committee and the college's office of instruction. The tenure committee and the office of instruction both prepare recommendations and meet in conference to reach a consensus. That recommendation is made to the president of the College, who makes a recommendation to the board of trustees, which makes the final decision. The record is silent as to the effect of the faculty employees' recommendations.

The planning committee advises the chief executive officer of the College on the needs and goals of the College, but the record fails to state how that committee is staffed and how effective are any recommendations it might have made.

The board of trustees has established other committees it deemed necessary, such as the business occupations advisory committee, which meets annually to discuss curriculum changes with employees who work, hire or are trained in that area. At least one faculty employee and three classified employees have served on that committee.

The Board stated in its decision that collegiality weighed heavily against the finding of an appropriate unit because:

> "The Administration must seek the *advice* of the faculty on educational matters through the Faculty Assembly and its standing committees ***. The Assembly must also be *consulted* on changes affecting its participation in College decisions." (Emphasis added.)

The record does not support the conclusion that the faculty at the College exerts the kind of influence that we observed in *Yeshiva*. The evidence is very clear that the power the faculty wields is in the form of recommendations. We have not been supplied any figures as to the rate of acceptance of such recommendations by the board of trustees. Further, classified employees serve on every college-wide committee that the faculty does, including the faculty assembly, except for the tenure committee. Even the tenure commission does not grant tenure, but rather makes recommendations on those decisions to the board of trustees.

Historically, tenure has not been a decisive factor in a proper community of interests analysis. The Board has approved other units where both tenured employees and nontenured employees were mem-

bers. See, *e.g., Danville* 5 Pub. Employee Rep. (Ill.) par. 1084 (teachers and teacher aides were approved as a unit).

While collegiality, governance and peer review are certainly differences between the faculty and classified employees, they are not magic words that automatically disqualify a proposed unit, but are merely factors to be examined and weighed with other elements in considering whether a community of interest exists.

A proposed unit should be certified if it meets the applicable standards in the Act, even though a separate unit of classified employees would also be an appropriate unit. See *University of Illinois (Board of Trustees)*, 7 Pub. Employee Rep. (Ill.) par. 1103, No. 90—RS—0017—S (IELRB September 13, 1991).

Even if we were required to consider the Board's decision as binding, we would find it improper and against the weight of the evidence since an examination of the factors clearly favors approval for the proposed unit.

We now examine those elements of section 7 which were not fully considered by the Board.

BENEFITS, WAGES AND HOURS

All employees in the proposed unit, except security personnel who retain no benefits, receive the same life, health and dental insurance; have the same provisions for sick, personal, maternity and jury duty leave; share the same tuition reimbursement and travel expenses; can join the same credit union; and are part of the same retirement system. Their salary ranges take into account experience and education, and both groups are paid over a 12-month period and have the same pay dates. While accrued differently, both groups receive the same number of sick days per year, and also receive the same number of personal days. Classified employees receive paid holidays and vacations while faculty receive paid professional and sabbatical leave.

The Board argues that there are differences in the employees' work year in that faculty work either 9½- or 11-month schedules and classified employees work either 9½-, 11-, or 12-month schedules. However, counselors, who are members of the current unit, work 12-month schedules. Thus, classified employees would not be working a schedule different from one group already represented in the unit.

Further, while daily work hours do differ somewhat between the groups, we point out that classified employees are required to work a 40-hour week, the same as counselors who are current unit members.

UNIQUE ENVIRONMENT

Section 7 directs that any other relevant factors be considered in determining the appropriateness of a unit. A significant factor in this case is that the College is a small employer with a small number of proposed members in the unit which dramatically affects the employees' working environment.

The community in which the employees work is a closely knit one in which the 95 full-time faculty and classified employees work in three buildings and are in close contact through work and social activities; they are members of the same committees; attend the same informational meetings, seminars, classes, workshops and other College-sponsored functions; attend the same college-wide social functions; and many interact on a daily basis.

The smaller community in this case dictates we distinguish those Board decisions involving large universities where faculty and administrative employees have little contact or functional interaction. See, *e.g., Board of Regents of State of Illinois*, 2 Pub. Employee Rep. (Ill.) par. 1069, Nos. 84—0008, 84—0012 (IELRB May 30, 1986).

The Board approved a unit in *Sangamon State University (Board of Regents)*, 6 Pub. Employee Rep. (Ill.) par. 1148, No. 90—RC—0026—S (IELRB October 4, 1990), which it found only minimally exceeded standards of unit appropriateness since the two groups of building service workers and food service workers had no functional integration, interchange or common supervision, and minimal contact except for breaks in the same cafeteria. The case at bar presents a much stronger argument for determining a community of interests since all the employees involved share many common benefits and working conditions: substantial work-related contact and social contact; common supervisors for many employees and faculty; functional integration of positions; and some interchange of duties.

FUNCTIONAL INTEGRATION AND INTERCHANGEABILITY

In the reality of a smaller community, employees' duties often overlap: several classified employees have taught credit or noncredit courses at the College and have been guest speakers in classes taught by the faculty. For example, a division secretary taught Typing II; a building maintenance worker taught welding; the coordinator of audio-visual services taught a GED course; a word processing employee was a guest lecturer and demonstrator for several classes; a division secretary substituted for faculty on two occasions and conducted a nursing tour and orientation in place of a faculty member.

The educational backgrounds of faculty and classified employees are not starkly different in that not all faculty members are required to have college degrees, while some mid-management classified employees are required to have a bachelor's degree, or an equivalent level of college experience or training. All are required to have a high school degree.

We disagree with the Board's blanket interpretation that duties of the two groups differ greatly since classified employees have performed or perform regularly tasks that the Board designated as the sole province of faculty: teaching, counseling, preparing courses and materials, compiling material for class and serving on faculty committees.

It is further noted that physical plant personnel have picked up and delivered mail and acted as security guards while security guards have performed physical plant duties.

CONTACT AMONG EMPLOYEES

Many classified employees, faculty and counselors interact daily, both on a functional and personal level.

Certainly among the secretarial and support staff there is daily contact with faculty and counselors through the typing of assignments, syllabi, and tests; fielding phone calls; occasionally proctoring exams; questions by faculty regarding financial aid or jobs for students; questions regarding student counseling problems; administration of tuition reimbursement, payment vouchers, payroll and personal checks; ordering and purchasing textbooks for classes; and assisting faculty in obtaining student records, transcript, registration lists and other administration or admission requirements.

Faculty also have work-related contact with learning resource center (LRC) personnel when faculty need materials other than textbooks and direction in how to use those materials; one LRC assistant is a math tutor who administers make-up exams and discusses tutoring problems with faculty. Faculty must also contact other employees such as the typesetter who designs booklets and programs compiled by faculty; the assistant who plans the master schedule each semester; a public information coordinator who publicizes information for faculty; physical plant personnel to set up a room for faculty use; the maintenance employee who picks up and delivers mail each day; security personnel when there is a student problem or extra security is needed; data processing for test-grading; word processing for all copies, syllabi, tests and mailings; and athletic coaches regarding student progress in class.

There is also a great deal of social interaction on the small campus: all employees attend employee picnics, retirement parties and holiday luncheons. All employees are involved in campus events such as The Great American Smoke-Out, United Way campaigns, awards events, graduation receptions; and all employees are invited to meetings such as non-smoking classes, various wellness seminars and discussions of the College's financial situation. Further, both faculty and other employees work side by side at athletic events, earning the same hourly rate, and both groups use the same cafeteria at the College.

COMMON SUPERVISION

In many instances, faculty and classified employees are supervised by the same person. Each educational department has a division chairperson who supervises both faculty and classified employees in the division. Division chairpersons also supervise other classified employees. For example, the chairperson of the math and science division also supervises the assistant supervisor of the campus fitness center, who is a mid-management employee; and the chairperson of the agricultural and industrial division supervises the tool room attendant, who holds a physical plant position.

Another term of employment that both groups share is a grievance procedure that is essentially the same: The first step is an informal discussion with the immediate supervisor; the second step is written correspondence to a higher supervisor; and the third step is a written appeal to the president of the College. Faculty may then address the board of trustees and go to arbitration.

HISTORICAL PATTERN OF RECOGNITION

We also disagree with the Board that because the unit has represented faculty and counselors since 1974, a historical pattern of recognition favors precluding addition of new members.

The record establishes that throughout the history of the faculty's negotiations with the College, classified employees' benefits have historically paralleled those of faculty employees. As the hearing officer stated:

"Historically, each year, classified employees have been given notice of their pay increases only after collective bargaining negotiations for the faculty contract in the given year have concluded. The percentage increases in wages for classified employees have historically paralleled the percentage increase negotiated in the faculty contracts. Also, classified employees'

benefits of health insurance, sick leave and maternity/paternity leave have historically paralleled those same benefits as negotiated for the faculty unit."

Because the two groups of employees have been in symmetry for so long, the interrelationship between them clearly weighs in favor of finding a community of interest.

In considering all of the factors set out in section 7 of the Act, we find that there is certainly a community of interest demonstrated in this case. The unique, small-campus environment; the historical pattern of recognition and negotiations flowing from the faculty bargaining; the high level of functional integration between the two groups; the interchangeability of certain functions and duties; the high level of functional and social contact among all employees; the common benefits and grievance procedures; and the desire of the employees to seek self-determination on this issue all support such a finding.

For all of the foregoing reasons, we reverse the Board's dismissal of the IEA's petition and hold that the proposed unit is appropriate and that the Board is directed to hold an election as provided by the Illinois Educational Labor Relations Act.

Reversed and remanded.

TULLY, P.J., and RIZZI, J., concur.