CHICAGO PRINCIPALS ASSOCIATION, LOCAL 2, AMERICAN FEDERATION OF SCHOOL ADMINISTRATORS, AFL/CIO, Petitioner, v. ILLINOIS EDUCATIONAL LABOR RELATIONS BOARD *et al.*, Respondents.

Fourth District   No. 4—88—0436

Opinion filed August 4, 1989.—Rehearing denied September 19, 1989.

Ronald S. Cope and Alan M. Mullins, both of Ancel, Glink, Diamond, Murphy & Cope, P.C., of Chicago (David Lincoln Ader, of counsel), for petitioner.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and William D. Frazier, Assistant Attorney General, of Chicago, of counsel), for respondent Illinois Educational Labor Relations Board.

Patricia J. Whitten, of Chicago (John L. Wren, of counsel), for respondent Chicago Board of Education.

JUSTICE GREEN delivered the opinion of the court:

We affirm here a decision of the Illinois Educational Labor Relations Board (IELRB) holding that principals of schools operated by respondent, the Chicago Board of Education, a/k/a The Board of Education of the City of Chicago (Board of Education), are not "educational employee[s]" by the terms of section 2(b) of the Illinois Educational Labor Relations Act (Act) (Ill. Rev. Stat., 1984 Supp., ch. 48, par. 1702(b)), and, thus, are not entitled to organize for collective-bargaining purposes pursuant to section 3(a) of the Act (Ill. Rev. Stat., 1984 Supp., ch. 48, par. 1703(a)) and to require the Board of Education to bargain with them. *Chicago Board of Education*, 4 Pub. Employee Rep. (Ill.) par. 1074, case No. 84—CA—0002 (Illinois Educational Labor Relations Board, May 17, 1988).

The parties to this proceeding agree that (1) petitioner, the Chicago Principals Association (CPA), as its name implies, is a long-standing voluntary group of principals of schools operated by the Board of Education; (2) on January 9, 1984, CPA requested the Board of Education to bargain with it; and (3) the latter refused to do so. On March 27, 1984, CPA filed a charge with IELRB alleging the Board of Education had violated various sections of the Act by refusing to bargain collectively with CPA. On May 10, 1984, the charge was amended

to also contend the Board of Education had violated the Act by refusing to meet with the CPA president pursuant to a prior memorandum and prior practice of the parties. A complaint was issued by IELRB on June 24, 1985. After an evidentiary hearing before a hearing officer and a hearing before the IELRB, the IELRB issued an order on May 17, 1988, dismissing the complaint. The CPA has taken administrative review to this court. As we have indicated, we affirm.

Section 3(a) of the Act provides "educational employees" the right to organize for collective bargaining. Section 2(b) of the Act excludes from the definition of those who are "educational employees" those who are "supervisors" or "managerial *** employees." (Ill. Rev. Stat., 1984 Supp., ch. 48, par. 1702(b).) The IELRB found the principals were both "supervisors" and "managerial employees" and, therefore, not "educational employees" entitled to the protections of the Act for these reasons. The IELRB also held that neither any prior memorandum nor past practice required the Board of Education to meet with CPA nor did any prior memorandum or past practice enable the principals to organize pursuant to section 3(a) of the Act.

The position taken by CPA is based primarily upon its contentions that (1) because of the size of the system operated by the Board of Education and the lines of authority established, its principals are much more limited in responsibility and authority, particularly in regard to personnel, than is the case in most school systems; and (2) the legislature intended to place substantial limits on the applicability of both the supervisory and managerial exclusions of the Act's definition of those who are considered to be "educational employees." Accordingly, CPA vigorously argues that any determination that either the supervisory or managerial exclusion is applicable to CPA members is contrary to the manifest weight of the evidence and to law.

We first address the question of the "supervisor" exclusion and begin with consideration of the following definition appearing in section 2(g) of the Act:

> " 'Supervisor' means any individual having authority in the interests of the employer to hire, transfer, suspend, lay off, recall, promote, discharge, reward or discipline other employees within the appropriate bargaining unit and adjust their grievances, or to effectively recommend such action if the exercise of such authority is not of a merely routine or clerical nature but requires the use of independent judgment. The term 'supervisor' includes only those individuals who devote a preponderance of their employment time to such exercising authority."
> Ill. Rev. Stat. 1987, ch. 48, par. 1702(g).

■ The Board of Education and the IELRB maintain that, in order to find the supervisory exclusion was applicable to the principals involved here, the IELRB was required to be satisfied by a preponderance or greater weight of the evidence that (1) the principals have the authority in the interest of the employer to perform some of the functions of supervisors or to effectively recommend such action; (2) the exercise of such authority is not merely routine or clerical in nature but requires a use of independent judgment; and (3) a preponderance of the employment time of the principals is devoted to the exercise of this authority. This obvious requirement, which we deem proper, was set forth by IELRB in *Southern Illinois University Board of Trustees*, 4 Pub. Employee Rep. (Ill.) par. 1030, case No. 86—RC—0018—S (Illinois Educational Labor Relations Board, Nov. 17, 1987). Notably, section 2(g) lists the supervisory functions in the disjunctive, thus clearly stating that one need not perform all of those functions in order to be a supervisor. While the IELRB must be satisfied by a preponderance of the evidence as to the existence of the three listed elements, we can properly reject its determination in that regard only if it is contrary to the manifest weight of the evidence. *Environmental Protection Agency v. Pollution Control Board* (1986), 115 Ill. 2d 65, 503 N.E.2d 343.

The record quite clearly indicates that, within the organizational setup of the Chicago public schools, the school principals have little power or reason to directly perform most of the functions listed in section 2(g) of the Act. Rather, the principals make recommendations in regard to these matters. The requirement that these recommendations be made "effectively" is stated in contrast to recommendations which might be merely of a "routine or clerical" nature. Ill. Rev. Stat., 1984 Supp., ch. 48, par. 1702(g).

In regard to hiring, the evidence showed the participation of principals was minimal. Apparently, when a vacancy occurred in a school, a principal could interview teachers on an eligibility list and make a recommendation to a director of personnel in regard to a choice, but this was seldom effective. However, principals did have some substantial voice in the selection of teachers for such special programs as those entitled "Options for Knowledge" and "Effective Schools." These programs were used in a substantial number of schools but concerned only a small number of teachers in those schools. Principals were also given a substantial voice in the selection of one-third of the teachers in newly opened schools or when a large number of teachers were added to an existing school.

The evidence showed principals were encouraged to visit with

teachers who requested transfer to these schools and, upon obtaining information as to the ability of the teacher, to make recommendations concerning the transfer. According to the evidence, the principal could only block the transfer upon a showing of academic teaching deficiency of the teacher, and this was seldom done. Principals were also given the opportunity to request transfer of teachers from their school to one where the teacher might be able to perform better. Principals had the authority and responsibility to initiate disciplinary charges against a teacher which might result in disciplinary action being taken against that teacher.

The principals possessed the responsibility to initiate proceedings for layoff of teachers necessitated by an insufficient number of pupils to justify the number of teachers assigned to the school. Similarly, the principals could attempt to prevent a layoff by requesting that a position remain open. When an opening occurred for the position of assistant principal, the principal was permitted to recommend who should become the replacement, and the evidence showed this recommendation was usually accepted. Each year, the principal was required to evaluate the teaching staff and, if a teacher were found to be unsatisfactory, to issue a warning notice listing the areas of deficiency and recommendations for improvement. The principal was required to visit the classrooms of the teachers so designated and to confer with them. The evidence indicated that, if the principal reported the teacher had improved, no further action was taken against the teacher, and any charge was dropped.

Testimony was further presented that a principal's determination that a teacher's performance was still unsatisfactory resulted in the issuance of a form, rating the teacher as unsatisfactory, and this rating required a conference between the teacher, principal, superintendent of the district of the Chicago school system involved, and the district personnel officer. Then, the principal and superintendent were required to agree upon a joint recommendation as to whether to return the teacher at his or her present school or to transfer the teacher. Such a rating froze the teacher's salary, denied the teacher summer school employment, and blocked the teacher's promotion. Evidence was presented that those recommendations were usually followed by higher authorities. Principals had the responsibility to recommend the discharge of teachers in appropriate cases. Similarly, grievance proceedings started with a meeting between a teacher and a principal, with a responsibility on the principal to resolve the matter, if possible. Testimony was presented that the decision of the principal was usually upheld on subsequent review.

■ We deem the evidence presented sufficient to support the determination by the IELRB that the principals, in the exercise of independent judgment, effectively made recommendations in regard to the various supervisory functions listed in the definition of supervisor in section 2(g) of the Act. Determination of whether the principals spend a majority of their time "exercising" that authority was recognized by the IELRB as being a very difficult task. In struggling with this issue, the IELRB relied upon its analysis in *Southern Illinois University Board of Trustees*. There, it ruled that a foreman for a group of electricians employed by the subject institution, although performing functions described in section 2(g) of the Act, did not spend a preponderance of his time in that capacity. However, the IELRB concluded there that, ordinarily, "[w]hen an individual exercises significant supervisory authority on a continuing basis with respect to a substantial number of educational employees, that individual, in most instances, will meet the 'preponderance ... exercising' test even though the time spent recording or *acting on the results of the supervision may be small*." (Emphasis added.) *Southern Illinois University Board of Trustees*, 4 Pub. Employee Rep. (Ill.) par. 1030, at IX—121.

■ In the foregoing case, the IELRB found the foreman clearly spent a preponderance of his time performing nonsupervisory functions. Here, where the direct evidence was not clear how the principals spent a preponderance of their time, IELRB concluded the circumstantial evidence indicated the principals were engaged in a "continual on-going teacher evaluation process," which did not consist merely of giving advice to and conferring with teachers, but also involved the day-to-day responsibility of being cognizant of the teachers' performance. (*Chicago Board of Education*, 4 Pub. Employee Rep. (Ill.) par. 1074, at IX—302.) Under the uncertain evidence presented here, a determination by the IELRB that, even within the described bureaucracy of the Chicago public schools, the principals were inherently involved in an "ongoing" responsibility of evaluation which predominated the time of the principals was well within the expertise and discretion of the IELRB. We give considerable deference to its application of that expertise and hold the determination in regard to the time spent by the principals was not contrary to the manifest weight of the evidence. *Decatur Board of Education, District No. 61 v. Illinois Educational Labor Relations Board* (1989), 180 Ill. App. 3d 770, 536 N.E.2d 743, *appeal denied* (1989), 127 Ill. 2d 613.

■ The CPA argues that, under the express language of section 2(g) of the Act, the principals cannot be supervisors, because section 2(g) defines "supervisors" as "individual[s] having authority to ***

hire \*\*\* *other employees within the appropriate bargaining unit.*" (Emphasis added.) (Ill. Rev. Stat., 1984 Supp., ch. 48, par. 1702(g).) The CPA maintains this language unambiguously states that, for the supervisor exclusion from the term "educational employee" to be applicable, a person who would otherwise be a "supervisor" must be in the same bargaining unit as the employees being supervised. Citing the rule of statutory construction that every statutory word and phrase must be given effect (*Kozak v. Retirement Board of the Firemen's Annuity & Benefit Fund* (1983), 95 Ill. 2d 211, 447 N.E.2d 394), CPA contends the word "other" when qualifying the word "employees" must be taken to mean that a person is only a supervisor within the meaning of section 2(g) of the rule when that person is also an employee in the same bargaining unit as those that person supervises. The CPA asserts this interpretation is logical, because the Act envisions a format whereby all but a few of those working for an educational employer should be allowed to choose a bargaining unit, but those in supervisory capacities should not be in the same bargaining unit as those being supervised. The CPA maintains the problems of conflict of interest and loyalty which the Act seeks to avoid are solved by its interpretation of section 2(g) of the Act, by allowing the principals to organize in an entity such as CPA that would not include any personnel being supervised by the principals.

If the General Assembly had intended to permit individuals who devote a majority of their time exercising labor-related supervisory powers over others to organize for collective-bargaining purposes as long as their organization was separate from that of those they supervised, the General Assembly would have so stated directly and not in the extremely indirect manner suggested by CPA. Justifiable concern was expressed by the IELRB that the interpretation promulgated by CPA would virtually eliminate the position of supervisor and would limit those who could not require collective bargaining to those in the managerial category (Ill. Rev. Stat., 1984 Supp., ch. 48, par. 1702(*o*)) and the few people in the confidential exclusion to section 2(n) of the Act (Ill. Rev. Stat., 1984 Supp., ch. 48, par. 1702(n)). We agree with the IELRB that the legislature did not intend the interpretation maintained by CPA.

Because we uphold the IELRB determination that the CPA members are not "educational employees" within the meaning of section 2(b) of the Act, because they come within the supervisory exclusion set forth in section 2(b) and are thus unable to organize under section 3(a) of the Act, we need not decide whether the IELRB properly determined the principals are also included within the managerial exclu-

sion to section 2(b).

■ Finally, we come to the question of whether a prior memorandum or past practice required the Board of Education to meet with CPA or its president. In support of its contention such a meeting was required, CPA relies upon section 7(a) of the Act, which states in part:

"Nothing in this Act shall interfere with or negate the current representation rights or patterns and practices of employee organizations which have historically represented employees for the purposes of collective bargaining, including but not limited to the negotiations of wages, hours and working conditions, resolutions of employees' grievances, or resolution of jurisdictional disputes, or the establishment and maintenance of prevailing wage rates, unless a majority of the employees so represented expresses a contrary desire under the procedures set forth in this Act." Ill. Rev. Stat., 1984 Supp., ch. 48, par. 1707(a).

The CPA also calls our attention to *Village of Oak Park v. Illinois State Labor Relations Board* (1988), 168 Ill. App. 3d 7, 522 N.E.2d 161. There, an association which had consisted of both patrol officers and supervisors had been meeting with village officials for a period of time concerning wages, hours, and working conditions although the village officials had stated they refused to recognize the group as a bargaining agent. The appellate court affirmed an order of the Illinois State Labor Relations Board (ISLRB) in which the ISLRB had determined the association was entitled to be the bargaining agents for its members by virtue of an historical pattern of recognition within the meaning of section 9(b) of the Illinois Public Labor Relations Act. Ill. Rev. Stat. 1985, ch. 48, par. 1609(b); see also *City of Peoria v. Illinois State Labor Relations Board* (1988), 165 Ill. App. 3d 429, 518 N.E.2d 1325.

Here, CPA and its predecessors had met informally with the Board of Education for many years when, in 1965, a memorandum of understanding was entered into recognizing CPA as representing the principals regarding problems related to working conditions, salary, welfare, and professional responsibility. The agreement was extended each year until December 31, 1979, after which no written agreement was entered into. Meetings of some sort occurred until the Act became effective and, during this time, the Board of Education did deduct principals' CPA dues from the principals' pay and remitted the money to CPA. The Board of Education also recognized grievances brought by CPA on behalf of a member and processed those grievances until the effective date of the Act.

Prior to the effective date of the Act, the relationship between the association and the village in *Village of Oak Park* was much more like the ordinary collective-bargaining relationship between employers and exclusive bargaining representatives of the employees than was the situation here. However, certain aspects of such a normal bargaining relationship existed here until the Act took effect. Nevertheless, we deem the difference significant. Although some grievances involved salary, the evidence did not indicate any bargaining as to salary occurred after 1979. We deem this distinction alone sufficient to permit the IELRB to properly conclude no sufficient showing was made that CPA had historically represented the employees for collective-bargaining purposes up until the effective date of the Act.

In addition, the IELRB points out that section 7(a) of the Act speaks of "employee" and "employee organizations." (Ill. Rev. Stat., 1984 Supp., ch. 48, par. 1707(a).) "Supervisors" are excluded from the group designated as "employees" by section 2(b) of the Act. (Ill. Rev. Stat., 1984 Supp., ch. 48, par. 1702(b).) Thus, persons who are not "employees" are not entitled by the Act to the benefits of an historical pattern of bargaining. To support its argument, the IELRB relies upon its decisions in *Southern Illinois University*, 2 Pub. Employee Rep. (Ill.) par. 1090, case No. 85—UC—0007—S (Illinois Educational Labor Relations Board, June 24, 1986), and *Community High School District No. 218*, 2 Pub. Employee Rep. (Ill.) par. 1087, case No. 84—UC—0011—C (Illinois Educational Labor Relations Board, June 24, 1986). In *Village of Oak Park*, the court specifically explained that, by the terms of sections 3(n) and (s) of the Illinois Public Labor Relations Act (Ill. Rev. Stat. 1985, ch. 48, pars. 1603(n), 1603(s)), supervisors were permitted to be in the same bargaining unit as those they supervised if such was the case in a bargaining unit existing at the time of the effective date of that legislation. (*Village of Oak Park*, 168 Ill. App. 3d at 15, 522 N.E.2d at 166.) The Act contains no such provision. We agree with the IELRB and deem this paragraph to contain an additional reason why the CPA gained no right as an exclusive bargaining representative from its early dealings with the Board of Education.

For the reasons stated, we affirm the IELRB order dismissing the complaint, as amended, against the Board of Education.

Affirmed.

KNECHT and SPITZ, JJ., concur.