NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 240936-U

NO. 4-24-0936

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 30, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE BOARD OF TRUSTEES OF ILLINOIS STATE UNIVERSITY, | ) ) | Petition for Review of the Order of the Illinois |
| Petitioner, | ) | Educational Labor Relations |
| v. | ) | Board |
| THE ILLINOIS EDUCATIONAL LABOR | ) | |
| RELATIONS BOARD and THE AMERICAN | ) | No. 23-RS-0029-C |
| FEDERATION OF STATE, COUNTY & MUNICIPAL | ) | |
| EMPLOYEES, COUNCIL 31, | ) | |
| Respondents. | ) | |

JUSTICE VANCIL delivered the judgment of the court.
Presiding Justice Harris and Justice Zenoff concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court reversed and remanded, finding the Illinois Educational Labor Relations Board's conclusion that snack bar supervisors do not spend a preponderance of their work time performing supervisory functions was clearly erroneous.

¶ 2    On January 8, 2024, the Board of Trustees of Illinois State University (University) petitioned this court for judicial review of an order of certification issued by the Illinois Educational Labor Relations Board (IELRB) adding five Illinois State University (ISU) employees in the position of "food court/snack bar supervisor" (snack bar supervisor) to an existing collective bargaining unit. The University contends the IELRB erred in adding the snack bar supervisors to the bargaining unit because they are "supervisors" as the term is defined in section 2(g) of the Illinois Educational Labor Relations Act (Act) (115 ILCS 5/2(g) (West 2024)) and therefore not entitled to organize for collective bargaining.

¶ 3    For the reasons set forth below, we reverse the IELRB's determination and remand for further proceedings in accordance with this decision.

¶ 4    I. BACKGROUND

¶ 5    On April 30, 2023, the American Federation of State, County and Municipal Employees, Council 31 (Union) filed a petition with the IELRB, seeking to add four ISU employees in the position of snack bar supervisor to an existing collective bargaining unit comprised of approximately 300 other ISU employees. The University opposed the petition, arguing that the snack bar supervisors were excluded from the Act's coverage by virtue of being "supervisors" under section 2(g). See *id.* On October 23, October 24, and December 27, 2023, a hearing was held before an administrative law judge (ALJ). The following information was presented at the hearing.

¶ 6    ISU is located in Normal, Illinois. Approximately 20,000 students attend the university, and approximately 6,800 people are employed at the Normal campus. The campus offers eight different retail dining establishments for students, faculty, and staff: Qdoba Mexican Grill, The Landing, Timbers Grill, McAlister's Deli, the Business Bistro, the High School Student Store concession stand, and two Starbucks locations. Most of these restaurants are located in the Bone Student Center.

¶ 7    All eight retail dining establishments are operated by the Event Management, Dining, and Hospitality Department (EMDH). EMDH staff is organized as follows: approximately 300 student workers comprise the majority of the retail dining staff. Included within the approximately 300 student workers are 8 to 10 student managers. Above the student workers are snack bar attendants, of which there were 12 at the time of the hearing. Above the snack bar attendants are four snack bar supervisors. University witness Heather Berrocales, the senior

assistant director of the EMDH, testified that snack bar supervisors are similar to shift supervisors "[i]n the outside world." Above the snack bar supervisors are administrator Is, administrator IIs, and administrator IIIs. Berrocales compared these roles to an assistant manager, general manager, and district manager, respectively. Above the administrators are the senior assistant director, the associate director, and, at the top, the director. At the time of the Union's petition, only snack bar attendants were represented for purposes of collective bargaining.

¶ 8                                    A. Snack Bar Supervisors

¶ 9            Snack bar supervisors are full-time, hourly employees who, according to Berrocales, serve as the "manager on duty" of the establishment to which they are assigned. As stated, at the time of the hearing, four snack bar supervisors worked at the campus's retail dining establishments: Michael Stevenson worked at McAlister's Deli, while Jacob Cisco, Breana Osborne, and Jessica Schoenbrun worked at the Starbucks in the Bone Student Center. Snack bar supervisors' venue assignments are not permanent, and they may be moved to different venues by administrators depending on the retail needs of each venue. Snack bar supervisors report to the administrator of the venue to which they are assigned.

¶ 10           Snack bar supervisors have numerous duties, often related to overseeing the work of their subordinate employees. For example, they, along with administrators and student managers, may make initial station assignments for staff members at the beginning of each shift. Snack bar supervisors then continue to make assignments throughout the shift as needed, accounting for factors such as the departure and arrival of student workers, the number of customers, and specific workers' strengths and weaknesses. They also have the authority to assign work to both student workers and snack bar attendants, although Stevenson, Schoenbrun, and Osborne testified that they rarely assigned snack bar attendants work or moved them from the

stations they were assigned to at the start of their shift.

¶ 11      Snack bar supervisors do not decide student workers' schedules, nor do they have access to the student scheduling system. Snack bar supervisors, snack bar attendants, administrators, student managers, and other students are all responsible for training student workers. Student managers are hired by administrators, but they typically receive letters of recommendation from snack bar supervisors.

¶ 12      Snack bar supervisors frequently monitor the work of subordinate employees to ensure they are carrying out their assigned tasks and meeting the appropriate standards of performance and sanitation. If they observe a student worker's subpar performance, they are expected to address it by stopping the behavior, retraining the employee, or issuing discipline. Berrocales testified that snack bar supervisors are expected to spend "about 80 percent of their day *** monitoring, checking, evaluating and dealing with things in a supervisory capacity." However, on cross-examination, she acknowledged that she had not done a time analysis of how the snack bar supervisors actually spend their time day-to-day.

¶ 13      If snack bar supervisors witness student worker misconduct, they have several options. They can ignore the misconduct, as in the case of a student who, for example, is late for her shift but provides a reasonable excuse. They can engage in verbal counseling with the student, explaining the inappropriate behavior and working with the student to correct it. They may also choose to issue an infraction form, which is a written record of the misconduct, or report the employee's misconduct to a superior administrator. Although snack bar supervisors may confer with a superior for advice on how to address a particular instance of misconduct, it is within the supervisors' discretion as to which discipline option they choose.

¶ 14      The snack bar supervisors' issuance of infraction notices is the first step in a

disciplinary process. Once issued, the infraction form is forwarded to the EMDH personnel office, where a set number of discipline points are added to the student's disciplinary record. Berrocales explained that accumulating a certain number of points resulted in a more formal warning or possible dismissal. While all snack bar supervisors testified to being unaware of the point totals of individual students, Stevenson acknowledged that he had previously viewed a PowerPoint presentation explaining the point system generally, and Cisco testified that he knew accumulating a certain number of points resulted in termination. Additionally, Lisa Mayr, an administrator I, testified that she knew of the point system when she previously worked as a snack bar supervisor, and Berrocales testified that before termination, lower levels of point accumulation result in written warnings which are delivered to and discussed with student workers by snack bar supervisors.

¶ 15 Snack bar supervisors are also expected to maintain appropriate staffing levels throughout a shift. If the venue becomes overstaffed, they are authorized to send student workers home or, if appropriate, to a separate venue for temporary assistance. Similarly, if the establishment is understaffed, they may ask student workers to come in. There are no guidelines for managing staffing levels; the decision to call in students or send students home is based on the individual snack bar supervisor's experience and discretion. Snack bar supervisors need not ask permission from a superior before sending student workers home or asking them to come in.

¶ 16 Stevenson testified that for the majority of his shift, he generally performed the same work that the students and attendants did, including making sandwiches, interacting with customers, operating the register, running food out, busing tables, and cleaning. However, he acknowledged that even when performing these tasks, he will "check up on" the attendants and student workers often. Cisco also testified that he spends most of his day in the "back of house,"

restocking, taking inventory, and placing orders, but that he also was "always checking as, as needed" on attendants and student workers. Osborne and Schoenbrun echoed this sentiment, with Osborne stating, "I'm keeping an eye out and making sure everything is still running smoothly while I'm doing my stuff." Both Osborne and Schoenbrun testified that they monitor the work of snack bar attendants and student workers while simultaneously performing their own tasks. Mayr explained that snack bar supervisors "can't have blinders on. [They] have to continually keep [their] head on a swivel and see what other people are doing." Stevenson testified that he spent approximately 35% of his work time overseeing student workers, while Osborne and Schoenbrun testified that they spent the majority of their work time doing so. Cisco did not testify as to the amount of work time he spent overseeing student workers.

¶ 17        At the hearing, a copy of the job description for snack bar supervisors was admitted without objection. The job description contained a breakdown of the duties snack bar supervisors are expected to perform, with a number beside each one denoting the percentage of time a snack bar supervisor is expected to spend on a particular task. The duties are as follows: (1) "[p]romotes quality customer service. Focus on speed, courtesy, and accuracy of service. Continually interacts with customers in dining area to evaluate satisfaction levels"—30%; (2) "[o]versees and ensures food preparation and sanitary standards are maintained in food preparation and in the food prep, services areas, and Front of House areas. Assists with food preparation as staffing and business dictates"—30%; (3) "[t]rains, supervises, and evaluates employees on assigned shift"—20%; (4) "[e]stablishes and maintains simple account records, manages cash handling processes, and completes daily cash deposits"—5%; (5) "[a]ssists in planning, development, pricing, and rollout of new franchise directives (*i.e.* merchandising, menu items, etc.)"—5%; and (6) "[p]erform other duties as assigned"—5%. Additionally, snack bar supervisors are expected, at all times, to maintain

regular attendance and "[d]emonstrate full knowledge and acceptance of principles of diversity."

¶ 18                                B. Snack Bar Attendants

¶ 19         Snack bar attendants are full-time employees that are members of a collective bargaining unit represented by the Union. As a result, the terms of their employment are determined by a collective bargaining agreement between the Union and the University. The agreement sets out the procedures by which the snack bar attendants bid on their work schedules and venue assignments for the upcoming academic year and determines their hourly pay rate. The agreement also governs procedures for overtime work. Accordingly, snack bar supervisors do not have the authority to ask snack bar attendants to come in to work or work overtime and may not send them home before the end of their shift. Snack bar supervisors also do not recommend or issue discipline to snack bar attendants. They may make an initial report of a snack bar attendant's misconduct to an administrator, but this is their only involvement in the disciplinary process. Other staff members, like an administrator, fellow snack bar attendant, student manager, or student worker, may also make such reports. Additionally, performance evaluations for snack bar attendants are performed by the administrators who oversee their venue. Snack bar supervisors have no input or role in these evaluations.

¶ 20         Although snack bar supervisors have the authority to move snack bar attendants to different stations during their shift, both Stevenson and Osborne testified that they typically do not assign work to snack bar attendants. Stevenson testified that he spent approximately 5% of his work time monitoring, overseeing, and correcting the work of snack bar attendants. The other snack bar supervisors provided similar testimony, with Cisco and Osborne testifying that they spend less than 5% of their time monitoring, overseeing, and correcting the snack bar attendants' work and Schoenbrun testifying that she spends approximately 10% of her work time monitoring

and observing the work of snack bar attendants.

¶ 21                    C. ALJ's Recommended Decision and Order

¶ 22        On March 25, 2024, the ALJ issued a recommended decision and order. The ALJ found that snack bar supervisors lacked the authority to perform any one or more of the enumerated supervisory functions listed in section 2(g) of the Act (115 ILCS 5/2(g) (West 2024) with respect to snack bar attendants. He specifically stated:

> "There is no evidence snack bar supervisors are able to hire, transfer, suspend, lay off, recall, promote, discharge, reward, or discipline snack bar attendants, or effectively recommend such action. Nor do snack bar supervisors have any role in adjusting the grievances of the snack bar attendants. In fact, the record indicates snack bar attendants are supervised by the administrator or administrators overseeing the venues at which they work."

The ALJ further found that snack bar supervisors "devote a negligible amount of their employment time" to overseeing snack bar attendants. He therefore concluded that snack bar supervisors were not supervisors within the meaning of section 2(g) of the Act.

¶ 23        The ALJ acknowledged the University's argument that snack bar supervisors act as supervisors under the Act primarily with respect to the *student workers*, not snack bar attendants. However, he found that

> "the relevant inquiry is limited to whether the snack bar supervisors have authority to perform one or more of the enumerated supervisory functions, or to effectively recommend such performance, *with regard to other employees within the appropriate bargaining unit*. There is no dispute the appropriate unit for the placement of the snack bar supervisors is that proposed by the Union, which

includes the snack bar attendants, and there is no assertion or anticipation that student workers will or could be added to the proposed unit. Therefore, examining whether snack bar supervisors are supervisors within the meaning of Section 2(g) of the Act, with regard to student workers, is immaterial." (Emphasis in original.) As a result of this conclusion, the ALJ offered no analysis of the authority snack bar supervisors exercise over student workers.

¶ 24        The University filed exceptions to the ALJ's order, taking issue with multiple factual findings and arguing that the ALJ should have considered the snack bar supervisors' authority over student workers when determining their supervisory status. The Union filed a response to the exceptions, and the case proceeded to review by the IELRB.

¶ 25                          D. IELRB's Opinion and Order

¶ 26        On June 18, 2024, the IELRB issued its opinion and order. It began by adopting the factual findings of the ALJ, including, among other things, the findings that Stevenson spends approximately 40% of his work time overseeing the work of subordinate employees and Schoenbrun and Osborne spend over 50% of their work time doing so. The IELRB then agreed with the ALJ's reasoning with respect to snack bar supervisors' authority over student workers. It noted that, under section 2(g), a supervisor is defined as

> "any individual having authority in the interests of the employer to hire, transfer, suspend, lay off, recall, promote, discharge, reward or discipline *other employees within the appropriate bargaining unit* and adjust their grievances, or to effectively recommend such action if the exercise of such authority is not of a merely routine or clerical nature but requires the use of independent judgment. The term 'supervisor' includes only those individuals who devote a preponderance of their

employment time to such exercising authority." (Emphasis in original)

As a result, the IELRB concluded that the supervisory authority snack bar supervisors have over student workers, who are not members of a bargaining unit, was irrelevant.

¶ 27 The IELRB further distinguished the two cases on which the University attempted to rely. It acknowledged that in *Chicago Principals Ass'n v. Educational Labor Relations Board*, 187 Ill. App. 3d 64 (1989), we held that, despite the phrase "other employees within the appropriate bargaining unit" in the corresponding section to the current section 2(g) (Ill. Rev. Stat., 1984 Supp., ch. 48 ¶ 1702(g)), an individual did not need to supervise employees within the same bargaining unit in order to be considered a "supervisor" under the Act. *Chicago Principals Ass'n*, 187 Ill. App. 3d at 70. However, the IELRB noted that in 2023, Public Act 102-1138 (eff. Feb. 10, 2023) amended sections 2(b) and (o) of the Act (115 ILCS 5/2(b), (o)), changing their application to employees of the Chicago Board of Education. The IELRB noted that, "[a]s a result, the holding in *Chicago Principals Association* on the supervisory exclusion is no longer applicable to the position at issue in that very case." It therefore found the reliability of *Chicago Principals Ass'n* after Public Act 102-1138 to be "tenuous."

¶ 28 The IELRB also addressed one of its own prior decisions, *University Professionals of Illinois, Local 4100*, 33 PERI ¶ 73 (IELRB 2016), in which it cited *Chicago Principals Ass'n* and held that the authority to perform supervisory functions over employees *outside* of the bargaining unit was relevant in determining supervisory status. It factually distinguished both this case and *Chicago Principals Ass'n*, stating, "In contrast to school principals and university department chairs, the petitioned-for employees in this case are hourly employees who are front-line workers working in food court venues under the direction of multiple levels of supervisors." It concluded that the prior decisions were "influenced by the type of employees at issue." However,

the IELRB also noted, "Even if we were to apply *Chicago Principals Association* here, *** the record does not indicate that the petitioned-for employees exercise supervisory authority over student workers." It based this conclusion on the finding that snack bar supervisors do not spend the preponderance of their time exercising supervisory authority over student workers. Specifically, it repeated the ALJ's finding that Stevenson spends only 40% of his work time performing supervisory activities and stated:

> "The University's conclusion [that Stevenson spends the preponderance of his work time overseeing subordinate employees] is based on Stevenson's testimony that he did not mean that he was not looking at, watching, or observing student workers and snack bar attendants during the remaining 60% of his day, and that he will check on them often. Even assuming, *arguendo*, that looking at, watching, observing, and checking on amounted to supervisory authority, there is nothing in the record to substantiate the University's claim that it accounts for an additional 52% of Stevenson's work time. What is more, there is nothing to indicate that it accounts for the additional 11% [of Stevenson's work time] that could meet the preponderance requirement necessary for supervisory status."

The IELRB therefore affirmed the ALJ's recommended decision.

¶ 29 On June 21, 2024, pursuant to the IELRB's decision, the executive director of the IELRB issued an order of certification adding snack bar supervisors to the petitioned-for collective bargaining unit.

¶ 30 The University petitioned this court for review of the IELRB's decision. We allowed the Illinois Public Employer Labor Relations Association (IPELRA) to file an *amicus curiae* brief in this matter.

¶ 31                                    II. ANALYSIS

¶ 32        The University generally contends that the IELRB erred in its interpretation of section 2(g) of the Act to limit an analysis of supervisory authority to individuals within the supervisor's proposed collective bargaining unit. It argues that the IELRB was obligated to follow our contrary interpretation in *Chicago Principals Ass'n*, as well as its own past decisions. It then argues that, when appropriately considering the supervisory authority that snack bar supervisors exercise over student workers, we should find that they are supervisors under section 2(g).

¶ 33        The Union and the IELRB maintain that the IELRB was correct in considering only the supervisory authority snack bar supervisors exercise over snack bar attendants, members of their proposed bargaining unit. They argue that *Chicago Principals Ass'n* was legislatively overturned by Public Act 102-1138, and, even if it had not been, it is factually distinguishable from the instant case. They note that the IELRB is entitled to depart from its own prior decisions where that departure is not arbitrary or capricious. They further argue that, under any interpretation of section 2(g), snack bar supervisors are not supervisors under the Act because they do not exercise supervisory authority with respect to snack bar attendants or student workers.

¶ 34        The IPELRA, in its *amicus curiae* brief, urges us to reaffirm our holding in *Chicago Principals Ass'n*, asserting that the IELRB's decision "risks upsetting approximately 35 years of stable labor relations across the State of Illinois by now calling into question this Court's pronouncement that an individual can be a 'supervisor' within the meaning of Section 2(g) of the [Act] *** even though his or her subordinates are unorganized."

¶ 35        The applicable standard of review for IELRB decisions depends on whether the question presented is one of fact, one of law, or a mixed question of fact and law. *Board of Education of City of Chicago v. Illinois Labor Relations Board*, 2015 IL 118043, ¶ 14. Questions

of law, such as issues of statutory construction, are reviewed *de novo*. *Id.* ¶ 15. In contrast, an agency's factual findings are held to be *prima facie* true and correct and will be reversed only if they are against the manifest weight of the evidence. *Id.*; see 735 ILCS 5/3-110 (West 2024). Mixed questions of law and fact, which concern whether the established facts satisfy the applicable legal standard, will be reversed only when "clearly erroneous" or when the reviewing court is left with the definite and firm conviction that a mistake has been made. *Board of Education of City of Chicago*, 2015 IL 118043, ¶ 16.

¶ 36    A. "Other Employees Within the Appropriate Bargaining Unit"

¶ 37    The Act grants "educational employees" the right to organize for collective bargaining. *Chicago Principals Ass'n,* 187 Ill. App. 3d at 66. However, section 2(b) of the Act excludes "supervisors" from the definition of "educational employees" who are so entitled. *Id.* Section 2(g) defines a "supervisor" as

> "any individual having authority in the interests of the employer to hire, transfer, suspend, lay off, recall, promote, discharge, reward or discipline other employees within the appropriate bargaining unit and adjust their grievances, or to effectively recommend such action if the exercise of such authority is not of a merely routine or clerical nature but requires the use of independent judgment. The term 'supervisor' includes only those individuals who devote a preponderance of their employment time to such exercising authority." *Id.* § 2(g).

If an individual falls within the Act's definition of "supervisor," she is "excludable from labor organizations which otherwise represent those employees and act to protect their rights." *Board of Education of Community Consolidated High School District No. 230*, 165 Ill. App. 3d 41, 56 (1987).

¶ 38                                    1. *Past Interpretations of Section 2(g)*

¶ 39            In *Chicago Board of Education*, 4 PERI ¶ 1074 (IELRB 1988), the IELRB analyzed

the meaning of section 2(g)'s phrase "other employees within the appropriate bargaining unit."

There, the Chicago Principals Association (CPA), a group of Chicago school principals, filed a

complaint with the IELRB, alleging that the Board of Education of the City of Chicago (Board)

violated the Act by refusing to bargain with them or meet with the CPA's president. *Id.* Following

a hearing on the matter, a hearing officer issued a recommended decision and order finding the

principals were "supervisors" as defined by section 2(g) and, therefore, the Board was not required

to bargain with them or meet with their representative. *Id.*

¶ 40            The case proceeded to review by the IELRB. The CPA argued that whatever

supervisory authority the principals exercised, they exercised it over employees *outside* of the

bargaining unit they sought to create. *Id.* Because section 2(g) requires that supervisory authority

be exercised over "other employees *within* the appropriate bargaining unit," the principals

maintained that they could not be considered supervisors under the Act. (Emphasis added.) *Id.*

¶ 41            The IELRB disagreed. It stated:

                "A literal reading of the phrase 'within the appropriate bargaining unit'

        leads to the absurd result of negating the very exclusion in which the language

        appears. It would allow individuals who are truly 'supervisors' to avoid that

        appellation and become 'educational employees' under the Act merely by seeking

        an all-supervisory unit. As long as the individuals did not supervise anyone 'within

        the appropriate bargaining unit,' they could avoid a determination of supervisory

        status. Such a construction would effectively and impermissibly negate Section

        2(g) and rewrite the definition of 'educational employee.' We find nothing in the

language of Section 2(g) or elsewhere in the Act to authorize such a result. *** It is therefore irrelevant whether an individual's supervisory authority is over employees within or outside of the bargaining unit." *Id.*

It concluded that an individual was a supervisor under section 2(g) if he exercised "supervisory authority over other educational employees." *Id.* It subsequently determined that, under this interpretation, the principals in question were supervisors and therefore excluded from the Act's coverage. *Id.*

¶ 42 The CPA appealed the IELRB's decision to this court, and in *Chicago Principals Ass'n*, we addressed the meaning of section 2(g). We reasoned:

"[The] CPA contends the word 'other' when qualifying the word 'employees' must be taken to mean that a person is only a supervisor within the meaning of section 2(g) of the rule when that person is also an employee in the same bargaining unit as those that person supervises. ***

If the General Assembly had intended to permit individuals who devote a majority of their time exercising labor-related supervisory powers over others to organize for collective-bargaining purposes as long as their organization was separate from that of those they supervised, the General Assembly would have so stated directly and not in the extremely indirect manner suggested by CPA. Justifiable concern was expressed by the IELRB that the interpretation promulgated by CPA would virtually eliminate the position of supervisor and would limit those who could not require collective bargaining to those in the managerial category [citation] and the few people in the confidential exclusion to section 2(n) of the Act [citation]. We agree with the IELRB that the legislature did not intend the

interpretation maintained by CPA." *Chicago Principals Ass'n*, 187 Ill. App. 3d at 70.

We affirmed the conclusion of the IELRB that the principals in question were supervisors under the Act. *Id.*

¶ 43     In *University Professionals of Illinois, Local 4100*, 33 PERI ¶ 73 (IELRB 2016), the IELRB repeated its prior interpretation of section 2(g). There, in determining the supervisory status of department chairs at the University of Illinois, the IELRB noted our holding in *Chicago Principals Ass'n* that "in spite of the language of Section 2(g), the statutory exclusion for supervisors is not limited to individuals who supervise employees within the same unit." *Id.* It therefore concluded that it would consider the department chairs' supervisory authority over adjunct professionals, who were not members of the bargaining unit the department chairs sought to join. *Id.*

¶ 44     The IELRB and the Union acknowledge these past decisions but argue that *Chicago Principals Ass'n* is not controlling, as it has been legislatively overturned and is factually distinguishable. They further assert that the IELRB was entitled to depart from its own prior precedent in *Chicago Board of Education* and *University Professionals of Illinois, Local 4100* if its departure was not arbitrary or capricious. We will address each issue in turn.

¶ 45                    2. *Effect of Public Act 102-1138*

¶ 46     Prior to 2023, the language of section 2(b) of the Act defined an "educational employee" who was entitled to organize for collective bargaining as "any individual, excluding supervisors, managerial, confidential, short term employees, student, and part-time academic employees of community colleges employed full or part time by an educational employer." 115 ILCS 5/2(b) (West 2022). Following the passage of Public Act 102-1138 in February 2023, this

language was amended to define an educational employee as

> "any individual, excluding supervisors, managerial, confidential, short term employees, student, and part-time academic employees of community colleges employed full or part time by an educational employer ***. *However, with respect to an educational employer of a school district organized under Article 34 of the School Code, a supervisor shall be considered an educational employee under this definition unless the supervisor is also a managerial employee*." (Emphasis added.) 115 ILCS 5/2(b) (West 2024).

¶ 47    At the same time, the definition of "managerial employee" in section 2(o) of the Act was amended to include the following language: "with respect to an educational employer of a school district organized under Article 34 of the School Code, [a managerial employee is] an individual who has a significant role in the negotiation of collective bargaining agreements or who formulates and determines employer-wide management policies and practices." *Id.* § 2(o).

¶ 48    The IELRB and the Union assert that these amendments, which occurred after our decision in *Chicago Principals Ass'n* and which would allow the principals in that case to organize for collective bargaining if the case were decided today, demonstrated the General Assembly's intent to contravene the holding in that case.

¶ 49    It is indisputable that Public Act 102-1138 had the effect of allowing the principals of the Chicago Principals Association to organize for collective bargaining after its enactment. The clear language of the amended Act removed Chicago principals from the definition of supervisor unless they are also a manager who plays a "significant role in the negotiation of collective bargaining agreements or who formulates and determines employer-wide management policies and practices." Pub. Act 102-1138 (eff. Jan. 1, 2023) (amending 115 ILCS 5/2(o)). However,

nothing in the amended language of the Act undermines the *reasoning* we employed in *Chicago Principals Ass'n* for finding that the phrase "other employees within the appropriate bargaining unit" should not be read to limit an analysis of supervisory authority to those individuals within the same bargaining unit as the supervisor.

¶ 50          In attempting to determine the intent of the legislature in making these amendments, we find it telling that the amendments to section 2(b) and (o) are specifically limited in their application to "educational employer[s] of a school district organized under Article 34 of the School Code." 115 ILCS 5/2(b), (o) (West 2024). So, even when presented with the opportunity to amend section 2(g) more generally and disrupt our prior interpretation of the phrase "other employee within the appropriate bargaining unit" in section 2(g) by changing or clarifying that particular phrase, the legislature chose not to. Instead, it merely added language removing Chicago principals from the reach of our holding. From this, we conclude that the General Assembly did not seek to overturn our reasoning in *Chicago Principals Ass'n*, only its ultimate result as it related to Chicago principals. See *Moon v. Rhode*, 2016 IL 119572, ¶ 33 (finding legislative acquiescence where, "despite *** numerous amendments, the legislature has not amended the [statutory] language in a way that would indicate a disagreement with our appellate court's consistent and repeated construction of the statute").

¶ 51          It may be argued that the General Assembly focused on Chicago school principals in drafting its amendments because this was the group of individuals who sought to organize for collective bargaining in the only case in which we applied our interpretation of section 2(g). So, undoing the result of *Chicago Principals Ass'n* might be seen as a direct criticism of our interpretation. However, as we stated in *Chicago Principals Ass'n*, "[i]f the General Assembly had intended to permit individuals who devote a majority of their time exercising labor-related

supervisory powers over others to organize for collective-bargaining purposes as long as their organization was separate from that of those they supervised, the General Assembly would have so stated directly." Similarly, we conclude that if the General Assembly had intended to overrule our interpretation of section 2(g), it would have done so explicitly, rather than merely carving out an exception from our ruling for Chicago principals.

¶ 52    To conclude, we find nothing in the amended language of section 2 of the Act that overturns our interpretation of that section in *Chicago Principals Ass'n*. We therefore find no reason to depart from our prior interpretation, and we determine that it should apply to the instant case.

¶ 53                              3. *Factual Distinction*

¶ 54    We are also unconvinced by the IELRB's attempt to distinguish the instant case factually from *Chicago Principals Ass'n* and *University Professionals of Illinois, Local 4100* based on the nature of the roles of the respective employees in each case. In its opinion and order in the present case, the IELRB stated that it found the Union's suggestion that the prior decisions were "influenced by the type of employees at issue, school principals" to be "compelling." However, the IELRB did not offer any further analysis of this issue, nor did it articulate how the difference in the type of employee at issue had any bearing on an interpretation of the phrase "other employee within the appropriate bargaining unit" in section 2(g). Indeed, on appeal, the IELRB and the Union *still* do not explain the significance of the difference in positions, instead stating only that the position of a Chicago school principal differs from that of an ISU snack bar supervisor, a fact we do not dispute.

¶ 55    In *Chicago Principals Ass'n*, we did not base our interpretation of section 2(g) on the type of employee we were tasked with analyzing in that particular case. Rather, we based our

reasoning on principles of statutory construction by discerning the legislative intent through the plain language of the statute and not interpreting any part of it so as to render another part superfluous. *Chicago Principals Ass'n*, 187 Ill. App. 3d at 70. Similarly, in *University Professionals of Illinois, Local 4100*, the IELRB did not indicate that its interpretation of section 2(g) was in any way influenced by the nature of the department chairs' positions. See *University Professionals of Illinois, Local 4100*, 33 PERI ¶ 73 (IELRB 2016). The IELRB merely cited our decision in *Chicago Principals Ass'n* and our concern that interpreting section 2(g) to consider supervisory authority only as it relates to employees within the same bargaining unit as the supervisors would allow supervisors to circumvent the Act's supervisor exclusion by deliberately organizing collective bargaining units so as to contain only supervisors. The IELRB and the Union have not presented us with any reason to conclude that the interpretation of section 2(g) in these cases was dependent on the nature of the employees at issue, nor that the differences between principals, department chairs, and snack bar supervisors should so distinguish the instant case as to trigger an entirely contradictory reading of section 2(g) than the one that has been previously accepted.

¶ 56                    4. *Departure From Prior IELRB Decisions*

¶ 57            The Union and the IELRB nevertheless argue that the IELRB is entitled to depart from its past decisions if its reasoning for doing so is not arbitrary or capricious. While true, whether or not the IELRB was entitled to depart from its prior decisions is irrelevant because we have concluded that our interpretation of section 2(g) in *Chicago Principals Ass'n* remains correct. Therefore, even if it provided nonarbitrary reasons for doing so, the IELRB erred in changing course to interpret section 2(g) to state that supervisory authority is relevant only where it extends to members of the supervisors' proposed bargaining unit.

¶ 58    In summary, we find the amendments made to section 2 of the Act did not legislatively overturn our reasoning in *Chicago Principals Ass'n*. We further find the instant case is not factually distinguishable from past decisions of this court and the IELRB based on the relative types of employees seeking to organize in each case. As a result, we conclude that our interpretation of section 2(g) in *Chicago Principals Ass'n* controls this case. Therefore, the inquiry before us is whether the ISU snack bar supervisors exercised supervisory authority over any subordinate workers, not merely the snack bar attendants who were included in the bargaining unit in which they sought inclusion.

¶ 59    B. Application of Section 2(g) to Snack Bar Supervisors

¶ 60    We have previously broken down the definition of a supervisor under section 2(g) into three components. *Board of Trustees of University of Illinois v. Illinois Educational Labor Relations Board*, 235 Ill. App. 3d 709, 717 (1992). To be a supervisor under section 2(g), an individual must (1) have authority in the interests of the employer to hire, transfer, suspend, lay off, recall, promote, discharge, reward, or discipline other employees or effectively recommend such action; (2) exercise such authority using independent judgment and not in a merely clerical or routine nature; and (3) spend a preponderance of his work time exercising that authority. *Id.* When reviewing the IELRB's determination that an individual qualifies as a supervisor under section 2(g), we apply a clearly-erroneous standard of review. See *Board of Trustees of University of Illinois v. Illinois Educational Labor Relations Board.*, 2018 IL App (4th) 170059, ¶ 84. Under the clearly-erroneous standard, we will reverse only if we are " 'left with the definite and firm conviction that a mistake has been committed.' " *Id.* (quoting *Board of Education of Glenview Community Consolidated School District No. 34 v. Illinois Educational Labor Relations Board*, 374 Ill. App. 3d 892, 899 (2007)).

¶ 61                                    1. *Limitations of the IELRB's decision*

¶ 62            As stated, both the ALJ and the IELRB determined that *Chicago Principals Ass'n* did not apply to the instant case. As a result, the ALJ limited his analysis to the supervisory authority snack bar supervisors exercised over snack bar attendants and did not consider the authority exercised over student workers, which the evidence showed was substantially greater. The IELRB, in turn, stated in its opinion and order, "Even if we were to apply *Chicago Principals Association* here, for the reasons discussed below, the record does not indicate that the petitioned-for employees exercise supervisory authority over student workers." However, despite this statement, the IELRB only provided an analysis of the authority exercised over student workers with respect to the third element in the three-part supervisor test, the "preponderance of time" requirement. Specifically, the IELRB addressed the University's exception to the ALJ's finding that Stevenson devoted only 40% of his work time to supervising snack bar attendants and student workers when the correct total was 92%. The IELRB stated:

> "The University's conclusion is based on Stevenson's testimony that he did not mean that he was not looking at, watching, or observing student workers and snack bar attendants during the remaining 60% of his day, and that he will check on them often. Even assuming, *arguendo*, that looking at, watching, observing, and checking on amounted to supervisory authority, there is nothing in the record to substantiate the University's claim that it accounts for an additional 52% of Stevenson's work time. What is more, there is nothing to indicate that it accounts for even the additional 11% that could meet the preponderance requirement necessary for supervisory status."

As for the remaining two elements, the IELRB merely repeated the conclusions the ALJ made

regarding the snack bar supervisors' authority over snack bar attendants, not student workers.

¶ 63        When reviewing a decision of the IELRB, we do not consider the record evidence anew. Instead, we examine the IELRB's factual findings to determine if they are against the manifest weight of the evidence, and we examine the IELRB's resulting legal conclusions to determine if they are clearly erroneous. *Board of Education of City of Chicago*, 2015 IL 118043, ¶ 15. As the correct consideration in the instant case is whether snack bar supervisors exercise supervisory authority over both snack bar attendants *and* student workers and the IELRB only considered the third element with respect to these two groups, we find our review limited to that element.

¶ 64                            2. *Preponderance of Time*

¶ 65        The IELRB has previously determined that a "preponderance" of time under the Act refers to an amount of time greater than 50%. Board of Trustees of *Southern Illinois University*, 4 PERI ¶ 1030 (IELRB 1987). In Board of Trustees of *Southern Illinois University*, the IELRB clarified this standard, stating:

> "Of course, in analyzing whether the preponderance or majority of time standard is met, we shall consider the time spent performing various tasks every day over a period of time. However, the inquiry will be more than just a simple calculation of the time an individual spends in any particular day or week overtly performing functions listed in Section 2(g). We shall take into account the responsibilities inherent in the position which are exercised on a continual, on-going basis, but are not always overtly or visibly manifested. When an individual exercises significant supervisory authority on a continuing basis with respect to a substantial number of educational employees, that individual, in most

instances, will meet the 'preponderance…exercising' test even though the time spent recording or acting on the results of the supervision may be small." *Id.*

¶ 66 We accepted this interpretation in *Chicago Principals Ass'n*, 187 Ill. App. 3d at 69. There, in the underlying administrative order, the IELRB found that the principals in question exercised a " 'continual on-going teacher evaluation process,' which did not consist merely of giving advice to and conferring with teachers, but also involved the day-to-day responsibility of being cognizant of the teachers' performance." *Id.* We affirmed that where the evidence showed that the " 'ongoing' responsibility of evaluation *** predominated the time of the principals," the "preponderance" requirement was met. *Id.*

¶ 67 We note that in *Chicago Principals Ass'n*, we did not conclude that the actual amount of time an individual spends exercising supervisory authority is irrelevant to determining whether the "preponderance of time" requirement was met. Rather, we determined that the time spent maintaining an awareness of subordinate employees, although not time spent performing one of the enumerated supervisory functions of section 2(g), such as hiring, firing, rewarding, or disciplining, might still be considered in determining if the individual is a supervisor. See *id.* Indeed, in *Board of Trustees of Southern Illinois University*, the IELRB concluded that a general foreman of electricians at Southern Illinois University did not spend the preponderance of his time performing supervisory functions where the evidence established that he spent 50 to 60% of his time estimating the man-hours and materials needed to complete various projects. *Board of Trustees of Southern Illinois University*, 4 PERI ¶ 1030 (IELRB 1987). Although the IELRB considered "other duties which may be considered in determining whether an individual is a supervisor," such as time spent overseeing subordinates' work, where these additional activities did not total more than 50% of the foreman's work time, the IELRB concluded the "preponderance

of time" requirement was not met. *Id.*

¶ 68     The University argues that snack bar supervisors exercise supervisory authority in directing and assigning work to both snack bar attendants and student workers, as well as disciplining student workers. For purposes of our analysis here, we will assume that these are supervisory activities, and we will assume that the snack bar supervisors use their independent judgment when performing these activities.

¶ 69     In his recommended decision and order, the ALJ made the following factual findings: all snack bar supervisors spend the majority of their shifts performing nonsupervisory tasks like those performed by their subordinate employees, such as food preparation, restocking, and cleaning. However, they also spend a significant amount of their work time monitoring their subordinate employees to ensure they are carrying out their assigned tasks correctly and to determine if they need to be moved to a different station in the venue. Stevenson spends approximately 5% of his work time monitoring snack bar attendants and 35% of his work time monitoring student workers, for a total of 40%. Osborne spends approximately 5% of her work time monitoring snack bar attendants and more than 50% of her work time monitoring student workers, for a total of more than 55%. Schoenbrun spends approximately 10% of her work time monitoring snack bar attendants and "slightly more than 50 percent" of her work time monitoring student workers, for a total of more than 61%. The ALJ found that when Cisco worked with a snack bar attendant in the past, he spent less than 5% of his work time monitoring the snack bar attendant. No evidence was offered, and the ALJ made no findings, as to the time Cisco spends overseeing student workers.

¶ 70     In its opinion and order, the IELRB stated that it would "adopt the facts as set forth in the underlying" ALJ's recommended decision. At no other point in its opinion did it express

disagreement with the ALJ's factual findings. Therefore, we will take the factual findings stated above as those of the IELRB. Because these facts are supported by the testimony of the witnesses, we conclude that the IELRB's factual findings are not against the manifest weight of the evidence.

¶ 71    However, we take issue with the IELRB's conclusion, from these facts, that snack bar supervisors do not spend the preponderance of their time performing supervisory functions. As stated, for our purposes, we make the same assumption that the IELRB made in its decision, that the time snack bar supervisors spend monitoring and assigning work to their subordinate employees constitutes time spent performing supervisory activities and that they use their independent judgment in performing these activities. Making this assumption, the IELRB's conclusion stands in direct conflict with at least half of its factual findings. The ALJ found that both Schoenbrun and Osborne spend over 50% of their work time monitoring their subordinate employees. This differs from the testimony of Stevenson, who stated that he spent only approximately 40% of his time monitoring the work of his subordinates. This conflict did not present an issue for the ALJ, as the ALJ only considered the time snack bar supervisors spent overseeing the work of snack bar attendants, which, by all accounts, was less than the majority of their work time. However, the IELRB purported to consider both the time spent overseeing snack bar attendants *and* student workers in drawing its conclusion. Yet from findings showing that Osborne and Schoenbrun spent the majority of their time overseeing student workers, the IELRB somehow concluded that snack bar supervisors, as a whole, do not. We find this irreconcilable.

¶ 72    The IELRB was entitled to discount the testimony of Osborne and Schoenbrun and give more weight to that of Stevenson. However, it did not state here that it did so. Rather, it adopted all the factual findings of the ALJ without amendment, including the finding that two of the four snack bar supervisors spent the majority of their time performing supervisory activities.

The IELRB may also have concluded that evidence showing that *one* member of the group of petitioned-for employees not performing supervisory activities for the majority of his work time was sufficient to conclude that *all* members of that group were not supervisors under the Act. Yet, the IELRB did not state that conclusion outright, and we will not assume its reasoning. Indeed, the IELRB provided very little analysis to assist us in reviewing its decision, merely pointing to the amount of time Stevenson testified to overseeing his subordinate employees and concluding that snack bar supervisors do not perform supervisory activities for the majority of their work time, simply ignoring any contrary findings it purported to have adopted.

¶ 73        We acknowledge the deference we are to give to the IELRB regarding mixed questions of law and fact. See *Board of Education of City of Chicago*, 2015 IL 118043, ¶ 16. However, where, as here, the IELRB's conclusion directly contradicts certain factual findings, with no explanation, we find its conclusion to be clearly erroneous.

¶ 74                                    C. Remand

¶ 75        Because the IELRB did not draw any conclusions regarding the first two elements as they relate to the combined authority snack bar supervisors exercise over snack bar attendants and student workers, we are unable to review these issues, as we would be conducting a *de novo* review. We therefore remand this case so that the IELRB may consider, in light of our holding here regarding the applicability of *Chicago Principals Ass'n*, whether snack bar supervisors are supervisors under the Act with respect to snack bar attendants *and* student workers. Additionally, we urge the IELRB to clarify its reasoning with respect to the "preponderance of time" element and explain why, if it accepted the findings that Schoenbrun and Osborne spend the majority of their time overseeing the work of their subordinate employees, it did not consider that testimony in reaching its ultimate conclusion.

¶ 76                                    III. CONCLUSION

¶ 77            For the reasons articulated above, we reverse and remand this case to the IELRB

for further consideration.

¶ 78            Reversed and remanded with directions.